MOORE, J.
BA jury rendered a responsive verdict against the defendant of guilty to one count of attempted aggravated rape of his mentally handicapped sister-in-law, Y.P., and guilty as charged of aggravated rape of R.Y., his five-year-old daughter. He was sentenced to fifty years without benefit of probation, parole, or suspension of sentence for the attempted aggravated rape conviction to run consecutively to a mandatory life sentence on the aggravated rape conviction. This appeal followed. We affirm.
FACTS
Ronnie York (“defendant” or “appellant” herein) was charged by secret indictment on January 25, 2008, for two counts of aggravated rape. The indictment charged that Count 1 was committed in violation of La. R.S. 14:42(A)(6) when York had sexual intercourse with the victim, Y.P., without her lawful consent because she suffers from a mental infirmity that would prevent resistance as defined by La. R.S. 14:42(C)(2). Count 2 was committed in violation of La. R.S. 14:52(A)(4) against a juvenile victim, R.Y., who was under the age of 13 at the time of the offense.
The facts adduced at trial revealed that Y.P. lives with her mother, and is the defendant’s mentally retarded former sis *1229 ter-in-law who has suffered from mental illness the majority of her life. The incident occurred while the defendant was separated from his wife and children, who were also living in the home. Although the exact date of the offense was not ascertained, the evidence indicated that the offense occurred at the victim’s mother’s house.
12R.Y. is the defendant’s daughter who was five years old at the time of the offense. This offense was committed while the victim and her infant sister were visiting their father for the weekend. After returning to her mother, the victim reported the offense to her mother, who contacted police. The victim disclosed the details of the crime during an interview at the Gingerbread House.
Following a hearing to determine the admissibility of the forensic interviews of the victims, including a Gingerbread House interview of R.Y., the court allowed the introduction of the video evidence pursuant to La. R.S. 15:440.5.
The defendant filed a motion to sever the two rape counts on May 21, 2012. After oral arguments, the motion was denied.
Trial was scheduled for May 21, 2012, but the case was transferred from Judge Michael Pitman to Judge Craig Marcotte pursuant to Local Court Rule 14, System of Random Allotment of Criminal Cases. The defendant objected to the transfer. After a hearing, the transfer was granted.
Trial commenced on May 23, 2012, and ended on May 24, 2012. Defendant was found guilty responsively to Count 1 of attempted aggravated rape of Y.P., and guilty as charged of aggravated rape of R.Y. as charged in Count 2 on May 24, 2011. He filed a motion for post verdict judgment of acquittal on June 11, 2012, alleging that the verdict was contrary to the law and evidence because the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty. Defendant contended that the state failed to prove sexual penetration, Uhowever slight, of either Y.P. or R.Y.
On the same day, defendant filed a motion for new trial under Art. 851(1)(2) alleging that the verdict was contrary to the law and evidence in that the state failed to prove beyond a reasonable doubt every essential element of the crimes: namely, the state failed to prove the defendant sexually penetrated R.Y., and the state failed to establish when and where the alleged rapes of R.Y. and Y.P. took place. Defendant also alleged that he was prejudiced by the joinder of Counts 1 and 2 in one trial, and prejudiced by the state’s allegation in opening statements that he fled the jurisdiction and postponed the prosecution of this matter.
Both motions were denied on June 12, 2012. Subsequently, on June 19, 2012, the defendant was sentenced on the aggravated rape conviction (Count 2) to a mandatory life sentence at hard labor without the possibility of parole, probation, or suspension of sentence. The court sentenced the defendant to 50 years at hard labor without the possibility of parole, probation, or suspension of sentence for the attempted aggravated rape conviction (Count 1). The court directed the sentences to be served consecutively.
This appeal followed.
DISCUSSION
In his first assignment of error, defendant argues that the district court erred by denying his motion for post-verdict judgment of acquittal due to insufficient evidence to support a conviction on either count. By his second assignment of error, he argues that the trial court erred in denying his Rmotion for new trial on *1230 grounds that the verdict was contrary to the law and evidence because the state had failed to prove all the essential elements of the crimes.[1] In both of these assignments appellant asserts that the evidence was insufficient to convict for each of the two convictions. Specifically, with respect to the conviction for attempted aggravated rape of Y.P., the defendant argues that the state did not present sufficient evidence to prove (1) any sexual contact occurred between the defendant and the victim, (2) Y.P.’s mental incapacity as required by statute, or (3) the date of the alleged contact. With respect to the conviction for the aggravated rape of R.Y., defendant alleges that the evidence was insufficient to show that anal intercourse occurred.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court |sdoes not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App. 2 Cir. 8/30/02), 827 So.2d 508, writ denied, 2002-3090 (La.11/14/03), 858 So.2d 422.
Thus, in order for the defendant’s convictions to be upheld, the record must establish that the state proved beyond a reasonable doubt all the essential elements of aggravated rape and attempted aggravated rape. We now consider each conviction in turn.
Defendant was charged with two counts of aggravated rape. La. R.S. 14:42(A) defines aggravated rape, in pertinent part, as follows:
Aggravated rape is a rape committed ... where the anal, oral, or vaginal sexual intercourse is deemed to be without the consent of the victim because it is committed under any one or more of the following circumstances:
[[Image here]]
(4) When the victim is under the age of thirteen years. Lack of knowledge of the victim’s age shall not be a defense.
[[Image here]]
(6) When the victim is prevented from resisting the act because the victim suffers from a physical or mental infirmity preventing such resistance.
La. R.S. 14:42(C)(2) defines “Mental infirmity” as “a person with an intelligence quotient of seventy or lower.”

Attempted Aggravated Rape of Y.P.

The jury returned a responsive verdict of attempted aggravated rape of Y.P. The elements of attempt are (1) specific intent *1231 to commit the crime and (2) an act or omission done for the purpose of and tending directly Rtoward accomplishing the crime. La. R.S. 14:27(A). Importantly, “attempt” is “a separate but lesser grade of the intended crime,” and even though it appears at trial that the crime intended or attempted was actually perpetrated by the person, he may be convicted of an attempt to commit the crime. La. R.S. 14:27(C).
Appellant complains that the state did not present sufficient evidence to prove any sexual contact occurred between the defendant and Y.P. nor her mental infirmity and the date of the alleged contact.
Tiwana Page, the defendant’s ex-wife and Y.P.’s sister, testified that she and her two daughters, R.Y., and L.Y. were living in the home of her mother, Gloria Page, in June of 2006. Her sister, Y.P., is mentally handicapped and also lives in the home. Although she was separated from the defendant, by mutual agreement, the two children, R.Y. and L.Y., spent weekends with their father. Ms. Page testified that some time after R.Y. reported the incident with her father to her around June 16, 2006, Y.P. told her and her mother that the defendant had performed oral sex on her. She said her mother contacted the police. She said that Y.P. could not tell them how many days, weeks, or months earlier that the incident occurred, but Ms. Page speculated that it was a few days.
Sergeant Paula Farquhar testified that she was employed by the Shreveport Police Department as a sex crimes unit investigator. She had been investigating the incident involving R.Y. when on September 11, 2006, she received a complaint from Gloria Page regarding Y.P. Sergeant Far-quhar was asked on cross-examination what Y.P. told her had happened. 17Reading from a transcript of the interview, she said that
[Y-P-] advised that Ronnie had licked her breast and felt and licked on her cat.... She advised me that he told her to go to Tiwana’s room and close the door. He told her to lay down, and he pulled her pants down. She advised that just the head went in. He was hunching her and moving his pelvis. He told her to suck his thing. She said it happened at nighttime.
Sergeant Farquhar testified that she used anatomical drawings in which Y.P. identified her vagina as her “cat,” and she drew a penis and showed where it was located on the defendant.
The court allowed the state to have Sgt. Farquhar read a transcript of her complete interview with Y.P. in which she related the entire incident including that the defendant had partially inserted his penis in her vagina.
Both Ms. Page and Sgt. Farquhar testified regarding Y.P.’s mental infirmity. Y.P. has always lived with her mother, Gloria Page. According to Ms. Page, Y.P. is unable to drive a car or manage money. She has worked the past 15 or 16 years for Frost Industries through the Caddo-Bos-sier Association for Retarded Citizens. She said that although Y.P. was 34 at the time of the alleged crime, she had about the same mental state as her daughter R.Y., who was 5 years old at that time. Sergeant Farquhar testified when she spoke with Y.P., it was apparent to her that Y.P. was not on a communication and thinking level appropriate to her age.
James Patterson, M.D., Ph.D., a psychiatrist employed by LSU Health Sciences Center in Shreveport, testified that he treated Y.P. from July 2005 to May of 2006. He diagnosed her with schizophrenia and mild mental retardation (“MR”). Y.P. has had two cognitive IQ tests — one showing mild MR (mental retardation) and one showing mild to moderate MR — indi- *1232 eating Ran IQ in the 55 to 65 range. He estimated Y.P.’s mental age to be between 7 and 10 years old. He stated that he did not believe Y.P. had the capacity to consent to sexual activity.
Y.P.’s mother, Gloria Page, testified that the defendant had come to her house to see his children R.Y. and L.Y. Tiwana was gone, but Y.P. was there. After he left, she went to her room to sleep. She later awoke and went to get a glass of water when she discovered that the defendant had returned. He was in Tiwana’s room with his infant daughter, L.Y. Y.P. was sitting on the sofa. Although she could not recall the date, she testified that she believed that this was when the defendant molested her daughter.
Y.P. testified at trial and identified the defendant as her sister Tiwana’s ex-husband. She affirmed that during the time period of February and March of 2006, the defendant came to the house while her mother was asleep. She let him in the house. She stated that he sucked her breasts and put his hand by her vagina. She said that the defendant “made her suck his thing,” and “I didn’t do it.” He licked and kissed her “cat.” She testified that the defendant told her to go Tiwana’s room, and he pulled her clothes down and spread her legs. She testified that the defendant put his tongue on her vagina and put the head of his private parts in her vagina.
Y.P. was not able to identify the exact month that the incident occurred. She acknowledged that it was some months after the incident occurred when she told her mother and Tiwana about it.
We note that there is no physical evidence of sexual contact between the defendant and Y.P. inasmuch as the incident likely occurred several | ^months before reported. There is some inconsistency of the three accounts (Y.P.’s account, her mother’s account, and her sister’s account) concerning Y.P.’s reporting the incident and when the incident likely occurred, whether Y.P. volunteered the information or whether it was the result of questioning by her mother, whether the incident was reported in a phone conversation or at home, and whether Y.P. told her mother alone or both her mother and Tiwana at the same time. These are very minor areas of confusion, and in many instances they are attributable to the rather lengthy and confusing questions posed. They are not enough, when viewed in the light most favorable to the prosecution, to cast sufficient doubt on what Y.P. reported substantively about the incident. We also note that the witnesses were trying to recall events that happened years earlier. We conclude that the testimonial evidence adduced from Y.P., viewed in a light most favorable to the prosecution, was sufficient to that prove that sexual contact occurred.
Appellant complains that the lack of a date of the offense involving Y.P. made it impossible to prepare a defense. According to Ms. Page, Y.P. reported the alleged incident to her and her mother some time after R.Y. had reported her sexual abuse in mid-June of 2006, but Y.P. could not tell what month it occurred; she believed it likely occurred a few days earlier. Sergeant Farquhar testified that the alleged incident involving Y.P. was reported on September 11, 2006, which was several months after the incident involving R.Y. was reported. Y.P.’s mother’s testimony is equally confusing on this point. Although Y.P. acknowledged at trial that the incident occurred in the time period of February and March of 2006, the | inappellant questions whether a mentally handicapped person could pinpoint a date six years after the alleged incident. She later testified that it was some months *1233 after the incident occurred that she told her mother and sister about the incident.
Based on our review, we conclude that the uncertainty regarding an exact date of the offense is of no moment in this case. It is clear from the testimony that the offense occurred during the time that Y.P.’s sister, Tiwana Page, was separated from the defendant and living with Y.P. and her mother, Gloria Page. Y.P. was the victim of this crime, and, even considering her mental infirmity, her testimony was the least ambiguous, indicating that the incident occurred several months before she reported it to her mother. The date is not an element of the offense defined under La. R.S. 14:42(A)(6), and La. C. Cr. P. art. 468 does not require the date or time of the commission of the offense to be alleged in the indictment unless the date or time is essential to the offense. The indictment refers to February or March of 2006 as the time period of the offense, and we note that defendant’s trial counsel never asked for a bill of particulars under La. C. Cr. P. art. 484.
The appellant also claims that the evidence did not establish that Y.P. was mentally infirm as required by the statute. We conclude that this assertion is without merit. The question is whether there was sufficient proof that her I.Q. was 70 or below. Dr. Patterson, who was accepted as an expert, testified without objection that two I.Q. tests done on Y.P. showed she had mild to moderate retardation and that her I.Q. range was 55 to 65. | nOn appeal, appellate counsel speculates that because Dr. Patterson said there was I.Q. testing done in 1997, and that her average I.Q. was 64.75 from three scores, one “can safely assume that some of her scores would have been above 64.75, possibly 70 or higher....” There is, however, no basis for this assumption. The overall I.Q. score was well below 70 and established by the
evidence. This assignment is without merit.
Therefore, after considering the evidence under the Jackson standard for the sufficiency of evidence to support the conviction of attempted aggravated rape of Y.P., the appellant has failed to show that the trial court erred in denying the defendant’s motion for post verdict judgment of acquittal and motion for new trial.

Aggravated Rape of R.Y.

An aggravated rape under La. R.S. 14:42(A)(4) is defined as:
[A] rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be committed without lawful consent of the victim because it is committed under any one or more of the following circumstances:
[[Image here]]
(4) When the victim is under the age of thirteen years. Lack of knowledge of the victim’s age shall not be a defense.
The defendant contends that the evidence was insufficient to show that he engaged in anal intercourse with R.Y., who was 5 years old when the alleged incident occurred. In support of this contention, he argues that the DVD interview of R.Y. does not establish that anal intercourse actually occurred, and R.Y.’s mother, when testifying at trial, did not initially recall telling police that R.Y. had told her that he had inserted his penis in her hifrom the back. It was not until she was shown a copy of the officer’s police report that she remembered that R.Y. told her that the defendant had put his penis insider her butt. Additionally, the pediatrician who conducted a physical examination of R.Y. within days following the report of sexual abuse revealed a normal examination with no signs of injury or abuse to the vagina (normal hymen) or anus.
*1234 Jennifer Flippo, a counselor with the Gingerbread House, conducted the interview of R.Y. on June 22, 2006, approximately 6 or 7 days after the alleged abuse occurred. In the course of the interview, R.Y. stated that her father had:
“... put his tongue on my tongue and he put my tongue on his tongue.”
“... made me touch his thing” with her hand.
“... made me suck.”
“... made me get on top of him.”
“... had me put his thing behind me in my panties.”
Following this last statement, Ms. Flippo asked R.Y. to draw a circle showing where “he put his thing” on a line drawing depicting the front and back of a female child. RY. did not draw a circle; instead, she traced over the buttocks of the female child depicted in the drawing. Ms. Flippo then asked, “Did it hurt when he was doing that?” RY. nodded affirmatively and responded, “I was burning the next morning.”
Ms. Flippo then asked: “Did he — did he just touch his thing to it or did he put his thing inside there?”
11SR Y. responded: “Inside.”
RY. demonstrated to Ms. Flippo that the defendant licked his fingers and inserted them “in her cat” and identified “her cat” as the vagina on the drawing of a female figure. When Ms. Flippo asked again, “So his thing, it went in your butt?” RY. nodded affirmatively. RY. denied that the defendant put his penis in her vagina, but only touched it with his “thing.” She subsequently denied that she had sucked any part of the defendant’s body, but that her father wanted her to suck his nipple, which she identified on the drawing.
During the course of the interview, R.Y. denied that her panties were ever removed and indicated that her father remained clothed as well, but “took his thing out of his boxers.” She said the incident occurred in the living room, but also indicated that more was done that night. It is not clear whether this occurred in the bedroom.
R.Y.’s mother, Tiwana Page, testified that R.Y. told her that the incident occurred in the bed when both R.Y. and her sister L Y. were sleeping with him. When asked during cross-examination what R.Y. had actually told her, Ms. Page said that R.Y. told her that the defendant “had her touching him up on his, well, breast area”... and “told me that he put his fingers in her underwear and went inside her vagina”... and “she also told me that he tried to make her perform oral sex on him.” Ms. Page did not state that R.Y. told her anything about anal sex.
On redirect examination, the state elicited the following responses from Ms. Page:
[ uState: “Do you recall whether [R.Y.] told you that Mr. York had put his penis in from the back?”
Ms. Page: “No. R.Y. told me that he had her touching him up here (indicating). And he put his fingers down her underwear and stuck his fingers in her vagina. And her exact words, she said, ‘He tried to make me put my mouth on him.’ She said, ‘But momma, I didn’t do it.’ Those were her exact words, the way she put it.”
State: Would you have told a police officer on that occasion that [R.Y.] told you he put his penis in from the back?
Ms. Page: I probably — I may have. If — but those three things I remember her telling me.
At this point, since Ms. Page obviously did not remember, the state showed Ms. Page the police officer’s report to refresh *1235 her memory by reading the report — after which, she confirmed that R.Y. told her that Mr. York had put his penis inside her butt and that is what she told the police officer.
Jennifer Rodriguez, M.D., testified as a pediatrician specializing in child abuse. She examined R.Y.’s vagina and anus on June 22, 2006, approximately one week after the alleged incident. Both areas were normal and did not evidence abuse. She testified that the majority of children examined for sexual abuse have normal findings on exam for a variety of reasons including the reason that the abuse does not involve penetration but also because of the healing power of children. She testified that in a study of children seen post-trauma who had known bleeding and pain, after two weeks only 14.6% of children had any findings consistent with trauma.
In addition to the lack of physical evidence, the appellant contends that the context of RY.’s responses to questions during the Gingerbread | ^House interview indicate that R.Y. stated that the defendant put his penis inside her panties, not inside her anus, and that the burning she experienced was consistent with the defendant inserting his fingers in her vagina. Appellant also attacks the credibility of Ms. Page’s refreshed testimony regarding anal intercourse, noting that it is incredible that she would forget that her child told her she had been anally raped.
After carefully reviewing the DVD of the Gingerbread House interview and testimony, we conclude that, viewing the evidence in a light most favorable to the state, a rational jury could conclude that the state has proven that anal intercourse occurred in this instance, as well as the other elements of aggravated rape. Although R.Y. indicated initially that the defendant “put his thing behind me in my panties,” she subsequently affirmed that the defendant had put his penis inside her. This evidence alone was sufficient to sustain the conviction. We therefore conclude that under the Jackson standard for sufficiency of evidence to sustain a conviction for aggravated rape, the trial court did not err in denying the motion for post verdict judgment of acquittal and the motion for new trial. This assignment is without merit.
By his third assignment of error, the appellant contends the district court erred, as a matter of law, in allowing the introduction of the Gingerbread House interview regarding Count 2, the charge of aggravated rape of R.Y. The appellant alleges that the transcript of this interview shows that, on 11 occasions, part of the interviewer’s question was inaudible, and on 18 occasions, part of R.Y.’s answer was inaudible. 11fiAppellant contends that in order for the videotape of an oral statement of the child to be admissible at trial, it must meet the requirements of La. R.S. 15:440.5(A)(3), which requires that the “recording is accurate, has not been altered, and reflects what the witness or victim said.”
As noted above, Jennifer Flippo conducted the interview of R.Y. at Gingerbread House on June 22, 2006. She testified that the videotape recording of the interview had not been altered or modified in any way. Ms. Flippo was available to testify or be cross-examined by either party-
After review of the video, we conclude that the trial court did not err or abuse its discretion by admission of the Gingerbread House video recording of the interview. We find very few “inaudible” words on the video, and overall, it complies with the statutory requirements. The defense does not indicate how the unclear portions of the DVD omit any crucial information. *1236 Additionally, both Ms. Flippo and R.Y. were available for cross-examination at trial to clear up any problems with what was said. This was not a case where the victim refused to testify at trial. We conclude that the defendant was not prejudiced, especially in light of the other testimony that separately established the elements of the crime.
By his fourth assignment of error, the appellant alleges that the district court erred, as a matter of law, in transferring this matter to another division for trial over defense objection.
Appellate counsel complains that the defendant was prejudiced by the transfer because it amounted to a permanent reassignment, and that the “good cause” showing by the state, that is, “the efficient and effective | ^administration of justice,” because the case had “languished far too long,” could be made “about practically any criminal case set for trial.... ”
A transfer hearing was held on this issue by Judge Scott Crichton. At that hearing the state argued that the case involved indictments that were 4 ½ years old, and the defendant had more than enough time to prepare for trial. The victims and their family were ready to proceed. The state noted that the defendant’s counsel had been on the case for about 1 ⅜ years, and argued that the effective and efficient administration of justice were the grounds for proceeding to trial, which was agreeable to both Judge Marcotte and Judge Pitman.
Defense counsel complains that while the indictment was filed in January of 2008, she did not receive the case until August of 2011. The delay in the trial was due to the defendant moving out of the jurisdiction because he did not know that he was the target of a grand jury indictment. She noted that the defense did not consent to the transfer and alleged that good cause had not been shown.
Judge Crichton concluded that the defense would not be prejudiced by the transfer and that the state had carried its burden. It noted that the victims had a right to closure and that the trial was a jury trial, not a bench trial, and there was no evidence of manipulation. He ordered the trial to proceed with Judge Marcotte presiding.
We find no abuse of discretion in Judge Crichton’s ruling. Accordingly, this assignment is without merit.
| iSBy his fifth assignment of error, the appellant alleges that the district court erred, as a matter of law, in denying the defendant’s motion to sever.
Appellant argues that the crimes were not of the “same or similar character” so as to warrant joinder under La. C. Cr. P. art. 493. Even if this court finds that the offenses were of the “same or similar character”, counsel argues, they should normally be severed if they have been joined solely for that reason because the evidence as to all crimes charged tends to cumulate to prove each, thus prejudicing the defendant in his right to a separate determination of his guilt or innocence on each charge.
La. C. Cr. P. art. 493 provides:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character and are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
*1237 The trial court has discretion to order separate trials when two or more offenses have been improperly joined to the detriment of the defendant or state. See La. C. Cr. P. art. 495.1. However, a motion for severance is addressed to the sound discretion of the trial court, and the ruling should not be disturbed on appeal absent a showing of abuse of discretion. State v. Deruise, 1998-0541 (La.4/3/01), 802 So.2d 1224; State v. Wade, 39,797 (La.App. 2 Cir. 8/9/05), 908 So.2d 1220, writs denied, 2006-0109, 2006-1048 (La.6/2/06), 929 So.2d 1251. A defendant bears a heavy burden of proof when alleging prejudicial joinder of offenses as grounds for a motion to sever. Factual, rather than conclusory, allegations are required. State v. Davis, 1992-1623 (La.5/23/94), 637 So.2d 1012; State v. Wade, supra.
In ruling on a motion to sever, the trial court must weigh the possibility of prejudice to the defendant against the important considerations of economical and expedient use of judicial resources. In determining whether joinder will be prejudicial, the court should consider the following: (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile. State v. Deruise, supra; State v. Brooks, 541 So.2d 801 (La.1989). There is no prejudicial effect from the joinder of two offenses when the evidence of each is relatively simple and distinct, so that the jury can easily keep the evidence of each offense separate in its deliberations. State v. Deruise, supra; State v. Brooks, supra.
In the instant case, we conclude that the defendant did not carry his heavy burden of proving prejudicial joinder of offenses as grounds for a motion to sever. The offenses fit the requirement that they be “of the same or similar character and are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.” They are similar in character in that they are both sexual abuse offenses, and they are based on connected acts in that the |2l)defendant abused members of his own family, taking advantage of victims who did not have the capacity to resist — one due to chronological and one due to mental age. Furthermore, when looking at the Demise factors, this is not a case where the jury would be confused by the counts or unable to segregate the charges and evidence. Nor would the defendant be confounded in presenting his various defenses. These were two offenses where the evidence of each was relatively simple and distinct, so that the jury could easily keep the evidence of each offense separate in its deliberations. We conclude that Judge Crichton’s decision to deny severance was not an abuse of discretion.
By his sixth assignment of error, appellant alleges that the district court erred, as a matter of law, in allowing the state to make prejudicial and sympathetic statements against the defendant in his opening and closing statements as well as misstatements of the testimony.
During its opening argument, the prosecutor said:
One of you wanted to know why it was so long between what happened and us coming to court today. Well, a lot of the reason is because Mr. York ... (objection by defense) ... Mr. York went to *1238 Colorado. And he was extradited back here from Colorado. And that process took some time....
Also, appellant contends that, over the defense’s objection, the state was allowed to bolster the reputation of good will, credibility, and public service of the Gingerbread House and Cara Center by stating that the former is a
magnificent organization, and we are blessed in this community to have the Gingerbread House. They have helped hundreds and hundreds of children over the years. And it is completely nonprofit. It employs skilled counselors and psychologists.
12iAnd the “Cara Center is another nonprofit organization that’s been established in our community to allow child victims of abuse to undergo clinical physical examinations by medical doctors.”
La. C. Cr. P. art. 766 states that “[t]he opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge.” Appellant contends that the remarks about the reputation of Gingerbread House and the Cara Center and assertion that the defendant fled to Colorado to delay and avoid prosecution prejudiced the jury against him before trial even started.
Similarly, under La. C. Cr. P. art. 774, the state’s argument should be limited to the evidence admitted, the lack of evidence, conclusions of fact that may be drawn therefrom and the law applicable to the case. It shall be confined to answering the argument of the defendant. Appellant contends that in closing argument, the prosecution made statements that appeal to prejudice by saying that
... Y.P. will never be able to have a meaningful relationship with a boyfriend.
... what fate took from [Y.P.] at the time of her birth ... cries out for some fairness for Y.P. to make up for all the things fate took away from her because of her mental infirmity.
... Something needs to be done for this girl to make up for what she’s lost. Also, with respect to R.Y., the prosecutor characterized R.Y.’s testimony that she went to check on her sister after the incident by saying,
She’s worried about her little sister at that time in her life, because she knows what has been done to her is horrific; and she wanted to make sure little sister had not had it done to her.
12!>And that, ladies and gentlemen, in my mind makes that child a saint. Appellant argues that R.Y. merely stated that she went to check on her sister to see if she was okay and never implied that she was worried or thought that her father had abused her.
Prior to the opening statements, the trial judge instructed the jury that “opening statements are not the facts and the evidence, but it is an outline of what they believe they will show.” It also said that “closing arguments are just that, arguments by the attorneys as to what they believe the facts and the evidence have shown in this case.” “But the facts and the evidence in this case are those that come from the witness stand.”
The state contends that its remarks about the appellant going to Colorado and being extradited back to Louisiana were not an accusation of flight, but were appropriate under La. C. Cr. P. art. 774, since Sgt. Farquhar testified that the appellant had left the state about the time she was finishing her investigation. Regarding the *1239 remarks about Y.P. and R.Y. during closing argument, the state notes that the defense did not lodge an objection to the comments and cannot now raise them as errors by assignment. La. C. Cr. P. art. 841.
After review, we conclude that to the extent there arguably was an “over-endorsement” of the Gingerbread House and the Cara House by the state, it was hardly significantly prejudicial to the defendant and was essentially harmless. The evidence submitted by Dr. Rodriguez of Cara House did not really implicate the defendant, and the Gingerbread House video was not advocacy by that organization; instead the whole process [⅛-⅜there was designed to protect against coaching and leading.
As for the state’s reference, in explaining the trial delay to the jury, to the fact that the defendant had left the state and was extradited, the state did not say that the defendant left to avoid prosecution, and the state did not put on evidence at trial to attempt to show flight.
The defendant’s trial counsel did not object to any part of the state’s closing argument; instead, appellate counsel argues for the first time that certain statements made appealed to prejudice in violation of La. C. Cr. P. art. 774. Undoubtedly, the statements about which counsel complains at least pushed the bounds of proper argument. However, La. C. Cr. P. art. 841 states in pertinent part that an irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence. Furthermore, the court instructed the jury that the opening statements were not the facts and the evidence, and that the closing arguments were just arguments — the facts and evidence come from the witness stand. Finally, even where the prosecutor’s statements are improper, credit should be given to the good sense and fairness of the jurors who have heard the evidence. State v. Fortune, 2010-0599 (La.App. 4 Cir. 12/22/10), 54 So.3d 761. We conclude that the statements are nowhere near being prejudicial enough to warrant overturning the jury’s verdict.
By his seventh assignment of error, the appellant alleges that the district court erred, as a matter of law, in allowing a state witness to read verbatim from the transcript of a victim’s statement that was not introduced into evidence.
124While Sgt. Farquhar testified, the court allowed her to read lines from a transcript of Y.P.’s taped interview. Appellate counsel complains that this was improper and that the defendant was prejudiced because it gave much more detail about the accusations against him compared to the actual trial testimony.
This assignment is without merit. First, it was defense counsel who initially asked Sgt. Farquhar to state what Y.P. said and allowed Farquhar to quote from the transcript. The state then was free on redirect to go further into the contents of the transcript to get even more information from it. Compare State v. Winfrey, 97-427 (La.App. 5 Cir. 10/28/97), 703 So.2d 63. Furthermore, under the circumstances, there was not much difference between Farquhar refreshing her memory from the transcript and then essentially telling the jury what it said, versus reading it to the jury. The information would have gone before the jury either way, so there was no prejudice.
By his eighth and final assignment of error, the defendant alleges that the district court erred, as a matter of law, in denying the defendant’s motion to reconsider sentence and rendering an excessive sentence against him.
*1240 • The defendant was sentenced to 50 years without benefits for the attempted aggravated rape, to run consecutively with the mandatory life sentence on the aggravated rape. Appellate counsel argues that the facts show “at best that Mr. York performed oral sex on his mentally handicapped sister-in-law on one occasion and had inappropriate sexual contact with his five-year-old daughter, on one occasion, but no actual intercourse.” 12sCounsel then asserts that the defendant “clearly is not one of the ‘worst offenders’ for whom the maximum sentences were intended.”
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Lathan, 41,855 (La.App. 2 Cir. 2/28/07), 953 So.2d 890, writ denied, 2007-0805 (La.3/28/08), 978 So.2d 297. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr. P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Hampton, 38,017 (La.App. 2 Cir. 1/28/04), 865 So.2d 284, writs denied, 2004-0834 (La.3/11/05), 896 So.2d 57 and 2004-2380 (La.6/3/05), 903 So.2d 452. The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La. 1981); State v. Haley, 38,258 (La.App. 2 Cir. 4/22/04), 873 So.2d 747, writ denied, 2004-2606 (La.6/24/05), 904 So.2d 728. There is no requirement that specific matters be given any particular weight at sentencing. State v. Shumaker, 41,547 (La.App. 2 Cir. 12/13/06), 945 So.2d 277, writ denied, 2007-0144 (La.9/28/07), 964 So.2d 351; State v. Jones, 33,111 (La.App. 2 Cir. 3/1/00), 754 So.2d 392, writ denied, 00-1467 (La.2/2/01), 783 So.2d 385.
Second, a sentence violates La. Const, art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 2001-2574 (La.1/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 2001-0467 (La.1/15/02), 805 So.2d 166; State v. Lobato, 603 So.2d 739 (La.1992); State v. Robinson, 40,983 (La.App. 2 Cir. 1/24/07), 948 So.2d 379; State v. Bradford, 29,519 (La.App. 2 Cir. 4/2/97), 691 So.2d 864.
Where there is a mandatory sentence, there is no need for the trial court to justify, under Art. 894.1, a sentence it is legally required to impose. State v. Burd, 40,480 (La.App. 2 Cir. 1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La.11/9/06), 941 So.2d 35; State v. Koon, 31,177 (La.App. 2 Cir. 2/24/99), 730 So.2d 503.
As a general rule, maximum or near maximum sentences are reserved for the worst offenders and the worst offenses. State v. Cozzetto, 2007-2031 (La.2/15/08), 974 So.2d 665.
|27In State v. Dorthey, supra, and State v. Johnson, 1997-1906 (La.3/4/98), 709 So.2d 672, the supreme court addressed *1241 the issue of mandatory sentences in the context of the habitual offender law. The court held that the downward departure from a mandatory minimum sentence may occur in rare circumstances if the defendant rebuts the presumption of constitutionality by showing clear and convincing evidence that he is exceptional, namely, that he is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the offender, and the circumstances of the case. This rule has been extended to mandatory sentences beyond habitual offender cases. See State v. Fobbs, 1999-1024 (La.9/24/99), 744 So.2d 1274; State v. Chandler, 41,063 (La.App. 2 Cir. 9/8/06), 939 So.2d 574, writ denied, 2006-2554 (La.5/11/07), 955 So.2d 1277. However, the “rare circumstances” described by Johnson in which a mandated sentence can be altered are even less likely in the case of a life sentence chosen by the legislature for a single crime, such as aggravated rape or second degree murder. State v. Chandler, supra. In such crimes, unlike the mandatory minimum sentence under the habitual offender law, the “tailoring” of the sentence by the legislature was for life because the culpability of offenders and the gravity of the offense are so great. Id.
The trial judge is given a wide discretion in the imposition of sentences within the statutory limits, and the sentence imposed by him should not be set aside as excessive in the absence of a manifest abuse of his discretion. State v. Williams, 2003-3514 (La.12/13/04), 893 So.2d 7; State v. Thompson, 2002-0333 (La.4/9/03), 842 So.2d 330; State v. Hardy, 39,233 (La.App. 2 Cir. 1/26/05), 892 So.2d 710. A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and, therefore, is given broad discretion in sentencing. State v. Cook, 95-2784 (La.5/31/96), 674 So.2d 957, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. Id.
The defendant’s argument on excessive sentence essentially is an attack on the convictions themselves in that it indirectly argues that the defendant should have, at most, been convicted for lesser included offenses. As far as excessiveness is concerned, the trial court was legally required to impose the life sentence for aggravated rape. Furthermore, as noted above, the “tailoring” of a sentence by the legislature is for life on a crime like aggravated rape because the culpability of offenders and the gravity of the offense are so great; thus, this is the kind of sentence that seldom, if ever, would qualify for a downward departure.
As for the maximum sentence for attempted aggravated rape of the sister-in-law, the trial court made reference to the article 894.1 factors, noting that the defendant should have known the victim was particularly vulnerable or incapable of resistance, and that the defendant used his position and status to facilitate the commission of the offense. Then the court said, “You know, without me going into a diatribe about the insidious nature of this or of these offenses ... this court hereby sentences you to 50 | gSyears at hard labor without benefit of probation, parole, or suspension of sentencej/... ”.
Considering the factors articulated by the court, and considering that a strong argument can be made that there was more than enough evidence to convict the defendant for aggravated rape of Y.P., the court’s sentence on the attempted aggravated rape does not shock the sense of *1242 justice. We find no abuse of discretion in sentencing.
CONCLUSION
For the reasons set forth above, the defendant’s convictions and sentences are affirmed.
CONVICTION AND SENTENCE AFFIRMED,

. Ordinarily, there is no appeal from the trial court’s refusal to grant a motion for new trial, except for error of law. La. C. Cr. P. art. 858; however, because the subject of this assignment is really sufficiency of evidence and this is a constitutional issue, we treat it as a motion for post verdict judgment of acquittal under La. C. Cr. P. art. 821. State v. Johnson, 584 So.2d 1216 (La.App. 2 Cir.1991), writ denied, 589 So.2d 1057 (La.1991).