Judgment rendered October 2, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,847-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

TRAVEON R. CANNON                           Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 374,408

Honorable Donald E. Hathaway, Jr., Judge

* * * * *

LAW OFFICES OF J. RANSDELL KEENE          Counsel for Appellant
By:  J. Ransdell Keene

JAMES E. STEWART, SR.                     Counsel for Appellee
District Attorney

JASON WAYNE WALTMAN
MARGARET E. RICHIE GASKINS
Assistant District Attorneys

* * * * *

Before COX, STEPHENS, and THOMPSON, JJ.

**THOMPSON, J.**

Traveon R. Cannon helped plan and implement the murder of Jaderris Montreal Taylor by picking him up the day of shooting, providing the pistol, shooting him at least one time, and then attempting to get rid of the firearm. Cannon did not realize he had inadvertently left his phone and identification at the murder scene, and when he was interviewed by the police, he lied to them about the events the night of the shooting. When faced with the substantial evidence connecting him to the shooting, Cannon eventually pled guilty to second degree murder and agreed to testify against his codefendant, in an apparent hope of receiving a downward deviation from the mandatory life sentence for second degree murder. Cannon claimed the codefendant shot the victim five times and was the more culpable of the two. The codefendant elected to proceed to trial and was convicted by that jury of the lesser charge of negligent homicide, for which he received a five-year hard labor sentence. At Cannon's sentencing, the trial court rejected the request for a downward deviation and sentenced him to the mandatory life sentence, which Cannon now appeals. For reasons more fully detailed below, we affirm his life sentence for second degree murder.

## FACTS AND PROCEDURAL HISTORY

On February 25, 2020, the body of Jaderris Montreal Taylor was discovered by a passing motorist on the edge of a road in Shreveport, Louisiana. He was pronounced dead at the scene, suffering from six gunshots: two to his chest, one to his right shoulder, one to his left arm, one to his neck, and one to his right cheek. Next to his body, police located a cigar, two .38 caliber shell casings, and a cell phone in a purple case lying

face down.  The back of the purple cell phone case had a storage compartment, which contained a Louisiana ID belonging to Traveon Rushaun Cannon ("Cannon"), the defendant in this case.

According to Taylor's family, Taylor was picked up from their home by a man named "Trey Cain" driving his mother's white Nissan with black rims, tinted windows, and a black spoiler.  The police investigation revealed that Cannon lived at home with his mother, Juanita Bush, who owned a white 2017 Nissan Altima with black rims, tinted windows, and a black spoiler.

The day following the shooting, Cannon was interviewed by Detective Saiz with the Shreveport Police Department.  After being read his *Miranda* rights, Cannon claimed the victim, Taylor, was a close friend and "almost like a brother" to him.  Cannon admitted to picking Taylor up from his home on February 25, 2020, in his mother's car, as described by Taylor's family members.  Cannon first told Detective Saiz that he and Taylor went to an apartment complex in the Southern Hills neighborhood to meet two men Taylor knew because Taylor wanted to trade a gun with them.  Cannon claimed he and Taylor got into an older model brown Impala with the two men, who drove them to South Shrevepark Drive.  Cannon claimed that one of the men asked for the gun and told them to get out of the car.  The man said that he wanted to shoot the gun and pretended like he was going to shoot it, but then he aimed the gun at Taylor and shot him.  Cannon claimed that, after hearing the first shot, he dropped his phone and ran away, hearing several other shots as he ran.  He claimed to have run through the woods and back to his mother's car.

2

As the interview continued, and Detective Saiz confronted Cannon with several inconsistencies in his story. Cannon changed his story and ultimately admitted to driving Taylor to South Shrevepark Drive himself in his mother's white Nissan. Cannon then admitted that another individual, Kasey Howard, was with them. Cannon described Howard as "like a cousin to me" and admitted that although he and Taylor were formerly close friends, at the time of this homicide, they were no longer close because they associated with different cliques.

Cannon then elaborated on this second version of the events the night of the shooting. He claimed Howard had observed Cannon and Taylor talking, which apparently offended Howard and led him to want to kill Taylor. Howard instructed Cannon to tell Taylor that they were going to go for a drive and shoot a gun. On the day of the shooting, Taylor rode with Howard and Cannon to Shrevepark Drive. Howard told Taylor to record a video of him shooting a gun that was in Cannon's glove compartment. Cannon explained that Howard shot the victim five times and then handed the gun to Cannon and told him to shoot Taylor too. Cannon admitted to shooting the victim once, at Howard's instruction.

Text messages and Instagram messages between Cannon and Howard indicated that they had been planning to kill Taylor since at least February 24, 2020. On February 24, 2020, Cannon messaged Howard stating, "Ima get da whip but aint gone have it that long how long it's gone take for us to do that," indicating he would use his mother's car but would not have it for long. Howard replied, "We can just pick him up and do it. He thank we fw some hoes," indicating they could lure Taylor to come with them because they were going to meet up with some women.

3

On February 25, 2020, at 11:52 A.M., Cannon messaged Howard: "U wanna hit his ass today or just wit (sic) Wait." Howard replied, "I want too." The pair messaged back and forth, decided on a location for the murder, and agreed they would use Cannon's mother's vehicle. Cannon picked up Taylor 6:30 P.M., and the shooting occurred a little later that evening. At 9:35 P.M., after the shooting had occurred, Cannon messaged Howard on Instagram saying, "They aint got shit," indicating that he believed there was no evidence connecting them to the murder.

After police identified Cannon from his phone and identification left at the scene, they obtained a search warrant for his residence and recovered eight live .38 special rounds and one spent .38 special shell casing in the dresser in Cannon's bedroom. Cannon's cell phone contained photos taken just two days before the shooting of him holding a pink-handled Smith & Wesson .38 special caliber firearm, which Cannon admitted was the firearm used during the homicide. The police confirmed that the location services on Howard's phone indicated that he was near the murder scene at the time the murder occurred. Messages on Howard's phone also indicated that at 11:01 P.M. on the night of the shooting, he was trying to get rid of the murder weapon by selling it to someone else.

On June 26, 2020, a Caddo Parish grand jury indicted Cannon and Howard with second degree murder, pursuant to La. R.S. 14:30.1, and Cannon filed a motion for mental evaluation and sanity panel. Counsel for Cannon observed that during interviews, Cannon was extremely "slow." His mother provided a personal history including mental disability, memory lapses, and a diagnosis of ADHD. The trial court appointed Dr. Marc Colon and Dr. Shelley Visconte to evaluate his condition at the time of the offense

4

to determine if he could distinguish right from wrong and whether he had the competency and capacity to proceed to trial.

Dr. Visconte filed a sanity report, with a finding that Cannon had Borderline Intellectual Functioning and Delusional Disorder (grandiose type) at the time of the crime but that these mental conditions did not have an appreciable negative impact on his ability to distinguish right from wrong. Dr. Visconte noted that Cannon was often slow to respond, with lengthy pauses before answering. Dr. Visconte noted deficits in areas of attention, visuospatial skills, and delayed recall. Cannon's ability to understand and retrieve verbal information, his perceptual reasoning score, and overall intellectual skills fell in the extremely low range. Dr. Visconte found Cannon was competent to stand trial because he performed well on an assessment of competence to stand trial in persons with intellectual disabilities.

Dr. Marc Colon filed his sanity report, finding that Cannon had a "factual and rational understanding of the proceedings against him and is able to rationally assist in his defense" despite his lower-than-normal score on the Montreal Cognitive Assessment (21 out of 30, with a score of less than 25 reflecting cognitive impairment of unknown origin). Dr. Colon's report contained details regarding Cannon's capacity to understand the proceedings against him. The report noted that Cannon understood the nature of the charge against him – second degree murder – and that it was serious because "someone died." Cannon acknowledged understanding of the different roles of courtroom personnel, including the role of the defense attorney who would "try to prove I didn't do the crime." Cannon also understood that the judge "sentences you" and the jury is "a group of people

who listen at court and they determine if you're guilty or not guilty." Cannon expressed understanding of the defenses available to him. Cannon distinguished a guilty plea from a not guilty plea and understood the consequences of each. Cannon stated that a guilty plea meant "I'd take the fall for it and then they sentence me," and a not guilty plea meant "I'm saying I didn't do it and it goes to court." Cannon acknowledged that he would be sentenced upon being found guilty. Dr. Colon's report did not provide any specific details or questions regarding Cannon's understanding of a mandatory life sentence.

On October 27, 2021, the trial court held a sanity hearing and then ruled that Cannon was competent to stand trial. The following year, on October 13, 2022, Cannon withdrew his former plea of not guilty and pled guilty to the charge of second degree murder. The record shows that his guilty plea was voluntarily and knowingly entered; the validity of his guilty plea is not at issue on appeal to this Court. Cannon's sentencing was deferred until after the filing of a motion requesting a downward deviation from the mandatory life sentence, and after the trial of his codefendant, Howard, at which Cannon offered to testify. Cannon was clearly hopeful his testimony against Howard would boost his potential for a downward deviation by the trial court from the mandatory life sentence that accompanied his guilty plea to second degree murder.

On August 22, 2023, after Howard's trial had concluded, Cannon filed a motion requesting the trial court make a downward departure from the mandatory sentence of life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. In his motion, Cannon argued that his extremely low intellectual functioning and his cooperation with the

6

State in the investigation and at Howard's trial qualified him as the exceptional defendant entitled to a lower sentence. At the sentencing hearing, the trial court declined to depart from the mandatory life sentence and sentenced Cannon to mandatory life. The record reflects the trial court considered the aggravating and mitigating circumstances, in accordance with La. C. Cr. P. art. 894.1, and acknowledged one mitigating factor, noting that Cannon had no history of prior delinquency or criminal activity. Although the trial court considered the motion for a downward departure in sentencing, it determined that a life sentence was an appropriate sentence for the murder of the victim, to which Cannon had pled guilty.

Cannon filed a motion to reconsider sentence, which was subsequently denied by the trial court after argument. This appeal followed.

## DISCUSSION

Cannon asserts one assignment of error on appeal relating to his life sentence.

**Assignment of Error: It was error to not vary from the statutory life sentence without benefits when the sentence was inequal and unjust under the circumstances of the case. The defendant in this case was of borderline in intellectual functioning and manipulated by a codefendant.**

Cannon argues that a downward deviation from the statutory mandatory minimum life sentence is appropriate in his case. Cannon asserts that he has no prior criminal record, is of extremely low intellectual functioning, aided the State in the prosecution of Howard by testifying against his codefendant, and admitted his participation in the offense at an early stage. Cannon asserts that to punish him with a life sentence is an injustice and an abuse of discretion and that his codefendant, Howard, took advantage of his intellectual disabilities, using him to help carry out a violent

7

murder. Cannon notes that Howard sent messages from jail for Cannon to not testify against him, in an attempt to obstruct the case against him. Despite this, Cannon did testify for the State against Howard during his trial.

Cannon argues that the sentence should be patterned on his youth, his extremely low intellectual functioning, his ultimate honesty about his participation in the crime, and his willingness to testify without promises. Cannon also notes that Howard, who elected to proceed to trial, was found guilty by a jury of negligent homicide. Cannon asks this Court to address the inequities of the situation as compared to Howard's sentence and to depart from the mandatory life sentence imposed by his guilty plea to second degree murder.

An appellate court utilizes a two-pronged test in reviewing a sentence for excessiveness. First, the record must show that the trial court complied with La. C. Cr. P. art. 894.1. *State v. Smith*, 433 So. 2d 688 (La. 1983). Second, the court must determine whether the sentence is constitutionally excessive. A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Smith*, 01-2574 (La. 1/14/03), 839 So. 2d 1, *citing State v. Bonanno*, 384 So. 2d 355 (La. 1980).

Where there is a mandatory sentence, there is no need for the trial court to justify, under La. C. Cr. P. art. 894.1, a sentence it is legally required to impose. *State v. Burd*, 40,480 (La. App. 2 Cir. 1/27/06), 921 So. 2d 219, *writ denied*, 06-1083 (La. 11/9/06), 941 So. 2d 35. The mandatory sentence for second degree murder is punishment by life imprisonment at hard labor without the benefit of parole, probation, or suspension of

8

sentence. La. R.S. 14:30.1(B). Louisiana appellate courts have repeatedly rejected the argument that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution. *State v. Parker*, 416 So. 2d 545 (La. 1982); *State v. Smith*, 49,839 (La. App. 2 Cir. 5/20/15), 166 So. 3d 416, *writ denied,* 15-1244 (La. 6/3/16), 192 So. 3d 753.

To rebut the presumption that the mandatory minimum sentence is constitutional and receive a downward departure in sentencing, a defendant must clearly and convincingly show that he is exceptional, which means that because of unusual circumstances he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. *State v. Johnson*, 97-1906 (La. 3/4/98), 709 So. 2d 672.

The Legislature's determination of an appropriate minimum sentence should be afforded great deference by the judiciary. The rare circumstances in which a mandatory minimum sentence is unconstitutionally excessive are even less likely in the case of a life sentence chosen by the legislature for a single crime, such as first degree rape or second-degree murder. *State v. York*, 48,230 (La. App. 2 Cir. 8/7/13), 121 So. 3d 1226, *writ denied*, 13-2154 (La. 3/21/14), 135 So. 3d 617.

The circumstances surrounding Taylor's senseless murder were extreme and displayed an absolute disregard for human life. Cannon was the primary actor in a premediated scheme to kill the victim. Cannon's messages to Howard planning the murder for some time were found on his cell phone. Surveillance footage from the victim's home confirms that he lured a former close friend into the vehicle. Cannon drove him to a remote

9

location and admitted to firing – from the gun he provided – at least one of at the six shots that ultimately killed the victim. When interviewed by the police, Cannon lied multiple times. After participating in the killing of the victim, Cannon left the body on the side of the road and did not call the police or 911. Instead, Cannon sent a text message to Howard expressing his belief that there would be no evidence connecting them to the murder and set about attempting to get rid of the murder weapon. While Cannon did have intellectual functioning disorders, the doctors who examined him determined that his disability did not have an appreciable negative impact on his ability to distinguish between right and wrong. Cannon clearly orchestrated and accomplished the plan of killing the victim and attempted to avoid the consequences.

This Court has repeatedly rejected the argument that a defendant's low IQ or limited intellect is, by itself, enough to make a sentence unconstitutionally excessive. *See State v. Little*, 50,776 (La. App. 2 Cir. 8/10/16), 200 So. 3d 400, *writ denied*, 16-1664 (La. 6/16/17), 219 So. 3d 341; *State v. Taylor*, 49,467 (La. App. 2 Cir. 1/14/15), 161 So. 3d 963; *State v. Crossley*, 48,149 (La. App. 2 Cir. 6/26/13), 117 So. 3d 585, *writ denied*, 13-1798 (La. 2/14/14), 132 So. 3d 410. Although Cannon did testify at Howard's trial, he had no plea agreement with the State to do so. The State and Cannon's attorney made it clear at the time of the guilty plea and sentencing hearings that there was no agreement with the State to recommend a downward deviation in sentencing and no commitment as to the length of his sentence. At sentencing, the trial court advised Cannon of the mandatory sentence of life imprisonment, and he acknowledged his understanding. Cannon's codefendant's conviction by a jury of a lesser

10

offense does not lessen Cannon's culpability for the acts he admitted to at the time of his guilty plea.

The mandatory sentence of life imprisonment for a conviction of second degree murder is presumed to be constitutional, and Cannon failed to demonstrate that he is an exceptional defendant for whom a downward departure from the statutory minimum sentence is required. Cannon's sentence is not out of proportion to the seriousness of the offense and is not a purposeless or needless infliction of pain and suffering. While, in hindsight, Cannon may regret not proceeding to trial or entering a guilty plea without an agreed-upon recommendation for a downward deviation in sentencing, his planning and execution of this murderous plot is undeniable. The trial court considered his request but obviously concluded Cannon's part in this killing did not merit a downward deviation in the mandatory sentencing. Accordingly, we find that Cannon's life sentence is not unconstitutionally excessive. Cannon's assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, Traveon R. Cannon's mandatory life sentence for second degree murder is affirmed.

**AFFIRMED.**