WICKER, J.
*1251 In this appeal, defendant, Noe A. Aguliar-Benitez, seeks review of the denial of a motion to suppress an incriminating statement taken during a custodial interrogation, the denial of a motion for new trial based on the failure to suppress that incriminating statement, and the excessiveness of his sentences for convictions of attempted aggravated rape and sexual battery. For the following reasons, we affirm the denial of the motion to suppress and the denial of the motion for new trial, vacate defendant's sentences as unconstitutionally excessive, and remand to the district court for resentencing.
Procedural History
On May 15, 2014, a Jefferson Parish Grand Jury returned an indictment charging defendant, in count one, with aggravated rape of a victim under thirteen in violation of La. R.S. 14:42,[1] and in count two, with sexual battery of a child under thirteen in violation of La. R.S. 14:43.1. At his arraignment on May 27, 2014, defendant pled not guilty to both counts.
On September 10, 2015, the district court held a hearing on defendant's motion to suppress a statement that he gave to Kenner Police after his arrest. Following the hearing, the district court denied defendant's motion from the bench.
On November 9 and 10, 2015, defendant's trial was held before a twelve-person jury. After deliberations, the jury unanimously found defendant guilty on count one of the lesser charge of attempted aggravated rape of a victim under thirteen in violation of La. R.S. 14:42 ;14:27, and guilty as charged on count two of sexual battery of a victim under the age of thirteen in violation of La. R.S. 14:43.1. On November 13, 2015, defendant filed a motion for new trial, which was not considered before sentencing.
On December 10, 2015, the district court sentenced defendant to the statutory maximum sentence on each conviction. As to his attempted aggravated rape conviction, the district court sentenced defendant to fifty years at hard labor without the benefit of parole, probation, or suspension of sentence. As to his sexual battery conviction, the district court sentenced defendant to ninety-nine years at hard labor without the benefit of parole, probation, or suspension of sentence. The district court ordered the two sentences to run concurrently.
Two days later, on December 12, 2015, defendant filed a motion to reconsider sentence, a second motion for new trial, and a motion for appeal. On January 19, 2016, the district court ruled that the motion for new trial was moot. The district court granted defendant's motion for appeal on January 28, 2016. On May 16, 2016, after a hearing, the district court denied defendant's motion to reconsider sentence and defendant's second motion for new trial. On May 22, 2016, defendant filed an additional motion for appeal addressing the May 16, 2016 motion to reconsider and motion for new trial rulings. The district court granted defendant's motion for appeal on May 25, 2016.
On December 7, 2016, in defendant's first appeal, this Court found that the trial court erred in failing to dispose of defendant's *1252 motion for new trial before sentencing. Therefore, this Court vacated defendant's sentences and remanded the case to the district court with instructions to dispose of defendant's pending November 13, 2015 motion for new trial before resentencing defendant. State v. Aguliar-Benitez , supra . This Court also vacated the district court's post-December 10, 2015 rulings in order to return the matter to its November 13, 2015 procedural posture at the time defendant filed his motion for new trial. Id.
After remand on January 26, 2017, the district court denied defendant's motion for new trial pending since November 13, 2015. On February 23, 2017, the district court resentenced defendant to the statutory maximum sentences for both convictions. As to his conviction for attempted aggravated rape of a victim under thirteen, defendant was again sentenced to serve fifty years at hard labor. As to his conviction for sexual battery of a child under thirteen, defendant was again sentenced to ninety-nine years at hard labor without the benefit of probation, parole, or suspension of sentence. Defendant was given credit for time served, and the district court ordered the two sentences to be served concurrently. Defendant filed a motion to reconsider sentence on February 24, 2017, which was denied by the court on April 20, 2017. This timely appeal follows.
Facts
Sometime in mid-to-late October 2013, E.M.P.,[2] an eight-year-old juvenile, told her mother, M.P., that in June 2013, defendant-a houseguest living in the family home[3] -had touched her legs, and that she did not want defendant to live with the family any longer. Concerned, M.P. continued asking her daughter about defendant touching her. Eventually, E.M.P. told her mother that defendant touched her vagina.
While defendant was living with E.M.P.'s family, defendant and E.M.P. developed a close relationship. She liked that he was living in the home with her family, and enjoyed playing with defendant.[4] Their relationship changed, according to E.M.P., after "[defendant] started touching me in my private part, and then I started not liking him." E.M.P testified that she did not tell anyone of the abuse, because defendant told her it was their "secret."
M.P. testified that, after E.M.P. disclosed the abuse to her, she noticed a change in E.M.P.'s behavior. Before the incident, she described her daughter as "a very sweet girl," but after the abuse she "seemed sad."
After learning of defendant's abuse, M.P. testified that she told her husband, R.M., that defendant touched E.M.P's vagina. R.M. testified that he asked his wife to take their children away from the house, *1253 while he asked defendant whether he touched his daughter. Under questioning, defendant became scared. R.M. told defendant he could no longer live in the home and punched him in the face. While the confrontation was taking place, E.M.P. testified that the rest of the family waited in a parking lot of a nearby Winn-Dixie and prayed.
Thereafter, M.P. took E.M.P. to her pediatrician, who recommended that she be taken to Children's Hospital for an evaluation. On October 21, 2013, E.M.P. was evaluated at Children's Hospital, and the Kenner Police Department was notified. Officer Paul Carmouche was dispatched to the hospital to talk to the family and made an initial report. The initial report identified defendant as the perpetrator. Later, Detective Joseph McRae was assigned to complete the investigation.
On November 9, 2013, Ann Troy, a forensic pediatric nurse practitioner who qualified at trial as an expert in childhood emotional, physical, and sexual abuse, and the delayed disclosure of that abuse, examined E.M.P. and performed a forensic interview regarding the June 2013 incident.
Ms. Troy concluded that E.M.P. had suffered child sex abuse. According to Ms. Troy's testimony and diagrams marked by E.M.P. during the interview and later admitted at trial, E.M.P. told Ms. Troy defendant touched her vagina. Further, E.M.P. told Ms. Troy that during the June 2013 incident defendant pulled her pants to the side and put his penis into her vagina. E.M.P told Ms. Troy that her brother was in the room when the incident occurred. Ms. Troy testified that she found E.M.P. to be clear and spontaneous during their interview, which was, in her opinion, indicative of truthfulness.
Ms. Troy also performed a physical examination of E.M.P. The exam did not reveal any injury to E.M.P.'s vagina. Ms. Troy testified that this is a normal finding in children who have been sexually abused, because young girls' bodies are resilient and can quickly heal without showing evidence of penetration.
On December 19, 2013, E.M.P. subsequently underwent a forensic interview with Brittney Bergeron of the Jefferson Parish Children's Advocacy Center, which was video recorded and played for the jury at trial. During that interview, E.M.P. recounted the details of her abuse. E.M.P. explained that defendant was living at the family home, and that she liked defendant, until he "did things [she] didn't like." Regarding the June 2013 incident, E.M.P. said she and defendant were watching television on the sofa in the living room when defendant started touching her leg. E.M.P told defendant to stop touching her, but defendant continued to touch her, including her "private part." E.M.P. told Ms. Bergeron that defendant pulled her shorts to the side, pulled his pants down, and touched "the skin of his private" against her private. During the interview E.M.P. could not recall whether defendant put "his private inside her private." E.M.P. explained that she wanted to kick defendant in his arm-which was in a cast after a work-related injury-but she feared a kick to defendant's arm would kill him.
E.M.P. recounted that defendant had touched "her private part" on other instances. E.M.P. told Ms. Bergeron that she thought defendant attempted to touch her on the upper thigh, but E.M.P. went outside the house, where two of her father's co-workers were, to avoid defendant's touching her. E.M.P. stated during the interview that she did not immediately tell her mom about defendant touching her, "because I didn't know how to tell [her]."
At trial, E.M.P. testified that she first told her mother in October 2013 that defendant had touched her. E.M.P. further testified that defendant touched her vagina *1254 with his hand and his private on more than once occasion, and at some point in time he started "licking [her] private part."
After receiving E.M.P.'s forensic interview report, on January 24, 2014, Detective McRae with the Kenner Police Department located defendant and thereafter interrogated him at the Kenner Police Department. According to his trial testimony, Detective McRae arrived at the address where he believed defendant was living at about 6:10 AM on January 24, 2014. When Detective McRae arrived at the residence, he asked a neighbor, a Hispanic male, whether defendant lived in the building. The neighbor said "yes," and let Detective McRae into the building. After entering the building, Detective McRae found defendant asleep in his bedroom. Because defendant does not speak English, the man who let Detective McRae into the building translated the initial conversation between defendant and Detective McRae. Detective McRae introduced himself as a member of the Kenner Police Department, informed defendant that he was there to discuss an investigation of sexual abuse of a minor, and asked whether defendant would like to make a statement at the Kenner Police Department. Defendant voluntarily agreed to go to the police station with Detective McRae and sat un-handcuffed in the front seat of Detective McRae's unmarked Ford Taurus during the ride.
Upon arrival at the Kenner Police Department, Detective McRae requested an interpreter, and Officer Cesari Cruz was assigned to interpret the interview.[5] Before the interview began, Detective McRae and Officer Cruz used a Kenner Police Department Advice of Rights Form to notify defendant of his Miranda[6] rights.[7] Detective McRae also notified defendant that he was under arrest relative to a suspected aggravated rape of a victim under the age of thirteen. The form listed defendant's rights in Spanish and English and was read aloud in Spanish by Officer Cruz. Defendant checked a box on the form indicating that he understood his rights and checked an additional box indicating that he did not wish to waive his rights.
After defendant invoked his right to counsel, both Detective McRae and Officer Cruz testified that they cut off questioning regarding the crime. Both testified that after defendant invoked his right to counsel, they explained to defendant the facts of the case and the charges against him. After learning the allegations made against him, Detective McRae testified that defendant said something like, "you know, there's demons and, you know, I did something."[8]
After hearing of defendant's "demons," Detective McRae testified that he told defendant, "I can't talk about the investigation as in question and answer because you already told me you didn't want to speak without a lawyer. However, I can tell you about the investigation."[9] At this point, *1255 defendant-according to Detective McRae and Officer Cruz-said, "No, I'll talk," and said he wished to speak to the officers without a lawyer present. Defendant agreed to change the mark on the Advice of Rights Form from not wishing to waive his rights to "Waiving his/her rights," and re-initialed the form to show he had changed his mind.[10] Officer Cruz testified that there was no temporal break between defendant's invocation of his right to counsel and notifying defendant of the evidence against him, and Detective McRae testified that defendant reengaged the officers without being coerced.[11]
After defendant decided to speak to the officers, the officers began an audio recording as defendant gave his account of what happened. That recorded statement was played to the jury at trial. During the interview, defendant confirmed he originally did not want to speak to the officers without an attorney but voluntarily changed his mind, stating that it is better to tell the truth than continue lying.
Defendant told police he was watching television in the living room with E.M.P. while her parents were home and her brother was in the kitchen. E.M.P. asked to borrow defendant's cell phone to play a game. When E.M.P. returned the phone to defendant, he began touching her right leg, and defendant thought he wanted to make love to her. The touching progressed to defendant taking off his pants to mid-way down his leg, pushing E.M.P.'s shorts to the side, rubbing his penis skin-to-skin against E.M.P.'s vagina, and masturbating. Defendant told the officers he ejaculated on E.M.P.'s stomach and cleaned his semen off with her panties. Defendant told officers that this was the only time he touched E.M.P.
Discussion
Assignment of Error One-Suppression of Statement Made to Police
Defendant argues since there was no temporal break between asserting his right to remain silent and to consult with a lawyer before answering any questions and detectives' discussion of the victim's preliminary disclosures to police, defendant's subsequent incriminating statement was the product of police coercion-in violation of defendant's Miranda rights-and should have been suppressed by the district court. The State contends that defendant's statement to Detective McRae and Officer Cruz was voluntary and, thus, not barred by the Miranda rule. Further, the State contends that informing defendant of incriminating evidence does not constitute interrogation in the context of the Fifth Amendment. Because defendant voluntarily and intelligently changed his mind and decided to give a statement, his statement was not in violation of Miranda and the *1256 district court properly denied the motion to suppress.
The district court's decision to deny a motion to suppress is afforded great weight and will not be set aside unless the preponderance of the evidence clearly favors suppression. State v. Poupart , 11-710 (La. App. 5 Cir. 2/28/12), 88 So.3d 1132, 1140, writ denied , 12-705 (La. 10/8/12), 98 So.3d 867. In determining whether the trial court's ruling on the motion to suppress is correct, an appellate court is not limited to the evidence presented at the suppression hearing; it may also review relevant evidence presented at trial. Id. The issue on appeal is whether Detective McRae and Officer Cruz continued to interrogate defendant after he asserted his right to counsel.
The record shows that defendant was advised of his rights in both English and Spanish and that he indicated he did not want to make a statement without a lawyer present. Once defendant invoked his right to counsel, Detective McRae and Officer Cruz testified they did not ask any additional questions, but, rather, explained to defendant the disclosures the victim had made to police at Children's Hospital. After hearing the evidence against him, defendant told Detective McRae and Officer Cruz "you know, there's demons and, you know, I did something," and the officers told defendant they could not discuss the case in a question-and-answer format, because he requested a lawyer. At that point, according to the officers, defendant changed his mind and stated that he wished to make a statement without a lawyer present.
In Miranda v. Arizona , supra , the Supreme Court found that when a suspect in a custodial interrogation indicates a desire to speak to an attorney, all questioning by police must cease. Miranda 's progeny has affirmed its basic holding and has provided guidance to law enforcement regarding what is necessary to protect the constitutional rights of the accused. After law enforcement informs the suspect of his right to silence, the suspect's invocation of that right must be "scrupulously honored." Michigan v. Mosley , 423 U.S. 96, 104, 96 S.Ct. 321, 332, 46 L.Ed.2d 313, 321 (1975). Under the Miranda rule, the suspect controls the custodial interrogation, with the ability to terminate the questioning by invoking his right to silence and consulting with a lawyer. Id.
For law enforcement to "scrupulously honor" the suspect's right to cut off questioning, interrogation cannot be resumed by further police-initiated questioning or other coercive police tactics; rather, after invocation of the right to counsel, interrogation may only resume if the suspect initiates further communication or conversations with the police. Edwards v. Arizona , 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1883-85, 68 L.Ed.2d 378 (1981) ; see also Minnick v. Mississippi , 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489, 498 (1990) ("In our view, a fair reading of Edwards and subsequent cases demonstrates that we have interpreted the rule to bar police-initiated interrogation unless the accused has counsel with him at the time of questioning. Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney."); State v. Abadie , 612 So.2d 1, 4 (La. 1993), cert. denied , 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993) ("[W]hen an accused prior to or during interrogation asks for counsel, a valid waiver of that right cannot be established by showing only that he responded to further police initiated, custodial interrogation even if he has been advised of his rights; and that such an *1257 accused is not subject to further interrogation by the authorities until counsel is present, unless the accused himself initiates further communication, exchanges, or conversations with police.").
However, under Fifth Amendment jurisprudence, nothing prevents an accused party "from changing his mind and giving a statement after he has previously declined to do so, so long as the statement is voluntary and intelligently made." State v. Daniel , 378 So.2d 1361, 1366 (La. 1979), citing Michigan v. Mosley , 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The Miranda rule is designed to protect an accused from giving a tainted statement under pressures of interrogation by police regardless of whether the pressure is from police badgering, overreaching, or subtle but repeated efforts of law enforcement to influence the suspect to waive his right to silence. State v. Hobley , 98-2460 (La. 12/15/99), 752 So.2d 771, 788 (citing Oregon v. Bradshaw , 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983) ; Edwards v. Arizona , 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981) ; see also Rhode Island v. Innis , 446 U.S. 291, 298-99, 100 S.Ct. 1682, 1688-89, 64 L.Ed.2d 297 (1980) ).
The record from this case-derived from both the hearing on the motion to suppress evidence and the trial-shows that Officer Cruz used an English/Spanish Advice of Rights Form to advise defendant of his Miranda rights, both orally and in writing. Defendant indicated that he understood his rights and wished to speak to an attorney. Detective McRae and Officer Cruz immediately cut off questioning and read defendant the allegations made by E.M.P. in the initial report. After learning of the evidence against him, defendant indicated that he "had demons" and "something happened." The officers told defendant that they could not ask questions because defendant indicated he wanted a lawyer. Defendant changed his mind and said he wished to speak with the officers without an attorney present. He changed the responses on his Advice of Rights Form, and defendant gave the incriminating recorded statement. At the conclusion of that recorded statement, defendant acknowledged that Detective McRae and Officer Cruz treated him well and did not threaten or coerce him.
Defendant asserts that Detective McRae and Officer Cruz's act of advising him of the victim's preliminary statement subsequent to his invocation of counsel was impermissibly coercive, and the confession should be suppressed as a violation of defendant's Fifth Amendment rights. Defendant asserts that officers cannot continue to engage a defendant after the defendant invokes his right to counsel. Defendant argues there was no temporal break between his invocation of the right to silence and the disclosure of the preliminary statement made by the victim. Due to the lack of a temporal break, defendant contends that he did not initiate the conversation with the officers, and his waiver of his right to silence was coerced. Therefore, the relevant inquiry is whether informing defendant of the evidence linking him to the crime is a coercive interrogation tactic.
Defendant argues the conduct of Detective McRae and Officer Cruz is more egregious than the conduct considered by the United States Supreme Court in Rhode Island v. Innis , supra . In Innis , the Supreme Court considered the definition of interrogation in the context of the Fifth Amendment and the Miranda opinion. Innis , 446 U.S. at 293, 100 S.Ct. 1682. In Innis , the suspect was being investigated for the kidnapping and murder of a Providence, Rhode Island taxi driver. The suspected perpetrator was apprehended, advised of his Miranda rights on two occasions, *1258 and requested to speak with a lawyer. The suspect was placed in a police vehicle, and the police captain supervising the investigation notified the transporting officers "not to question [the defendant] or intimidate or coerce him in any way." While transporting the suspect to the police station, the transporting officers shared their fear in a conversation among themselves that the murder weapon-a sawed-off shotgun-may have been discarded in a location near a school for handicapped children and could cause a tragic injury if the weapon was found by a child. The suspect, overhearing the conversation from the back seat of the patrol car, interrupted the officers' conversation and stated his wish to show the officers where the weapon was discarded in an effort to protect the school children. Id. at 293-96, 100 S.Ct. 1682, 1688-89.
Under these facts, the Supreme Court granted certiorari to define "interrogation" under Miranda and determine whether the conversation between the officers was an interrogation. Id. at 300-01. The Court defined "interrogation" as both direct questioning and its functional equivalent, and, more specifically:
the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.
Id. at 301-02. According to the Court, a defendant can also make voluntary statements after the invocation of counsel. Any statement given freely and voluntarily without any compelling influences is not barred by the Fifth Amendment and is admissible in evidence. Id. at 299-300.
Under the facts in Innis , the Court determined that the brief conversation between the officers in the front seat of a patrol car was not a ploy to elicit an incriminating response from the suspect, but, rather, a subtle compulsion that did not constitute questioning under Miranda . Id. at 303. Therefore, the defendant's decision to lead police to the weapon was voluntary, and his statements regarding the weapon did not implicate his Fifth Amendment rights.
Defendant asserts the officers' discussion with him of the victim's preliminary disclosures was a coercive interrogation tactic and constituted the functional equivalent of interrogation. However, jurisprudence supports the conclusion that mere disclosure of evidence and potential charges against a suspect, without more, is not interrogation under the Fifth Amendment. See State v. Reeves , 97-1806 (La. 06/26/98), 714 So.2d 696, 696 ; Enoch v. Gramley , 70 F.3d 1490, 1500 (7th Cir. 1995), cert. denied , 519 U.S. 829, 117 S.Ct. 95, 136 L.Ed.2d 50 (1996).
In State v. Daniel , 378 So.2d 1361, 1366 (La. 1979), the Louisiana Supreme Court *1259 considered whether the defendant's statement to police should have been suppressed, because officers did not honor the defendant's initial refusal to make a statement. In Daniel , the defendant was brought to a police station in Opelousas in connection with a double murder. During an in-station interrogation, defendant was read his Miranda rights and asked whether he would like to make a statement. The defendant replied with a "weak mild no," and signed a document indicating he did not wish to speak to police. Immediately thereafter, a district attorney present at the interview informed the defendant "of what we've got," which amounted to an eyewitness identifying the defendant as the murderer. Upon learning the evidence against him, the defendant confessed to the killing, and led officers into the swamp where the murder weapon was hidden. The Supreme Court found that the district court should not have suppressed the defendant's statement as the district attorney was not overbearing, and "[n]othing in Miranda prevents an accused party from changing his mind and giving a statement after he has previously declined to do so, so long as the statement is voluntary and intelligently made." Id. (citing Mosley , 423 U.S. at 96, 96 S.Ct. 321 ; Nash v. Estelle , 560 F.2d 652 (5th Cir. 1977) ; State v. Strahan , 348 So.2d 79 (La. 1977) ).
For the conduct of police to be the functional equivalent of interrogation, it must be more than declaratory statements of incriminating evidence linking the suspect to the crime. For example, in State v. Poupart , supra, this Court considered whether, after a suspect refuses to waive his privilege against self-incrimination, a brief recitation of the evidence against the defendant is the functional equivalent of interrogation. The defendant was convicted of public intimidation of a Jefferson Parish detective. The defendant enlisted a friend-who owned a bar in Metairie where the detective worked as a detail officer-to threaten the detective investigating the case that photographs of a woman posed in a compromising position on his squad vehicle would be posted on the internet if the detective testified at the defendant's upcoming battery trial. The detective was present at the defendant's battery trial, and within a month of the trial, two photographs were posted on theDirty.com. Id. at 1135-36. After the defendant's arrest for the public intimidation charge, he claimed that he had invoked his right to counsel, but that the police nevertheless cajoled him into making an inculpatory statement in violation of his rights under Miranda . Id. at 1140. At the suppression hearing, the interviewing lieutenant testified that the defendant refused to waive his Fifth Amendment rights, and that he asked the defendant whether he would be willing to listen to the evidence in possession of the State. The defendant agreed to listen, the lieutenant outlined the investigation, and the defendant gave a statement admitting that he took the photographs, but that he did not post them online. Id. at 1141. After a review of the record, this court found that the defendant's Miranda rights were not violated when the defendant was informed of the evidence against him, voluntarily changed his mind, and freely made a statement to police. Id. at 1142 ; see also State v. Taylor , 490 So.2d 459, 461 (La. App. 4th Cir. 1986), writ denied , 496 So.2d 344 (La. 1986) (after defendant invoked his right to counsel, investigating officers briefly explained the evidence against him in an armed robbery investigation, which caused the defendant to change his mind and give a statement; the court found the statement was a voluntary statement because the description of the evidence against him was informative and police did not unduly pressure him to make a statement).
Under Louisiana law, it is permissible for an officer, even after a suspect *1260 invokes his right to counsel and his privilege against self-incrimination, to inform the suspect of the evidence linking the suspect to the crime. Without more, the disclosure of evidence does not rise to the functional equivalent of direct questioning prohibited under Fifth Amendment jurisprudence. Here, Detective McRae and Officer Cruz immediately cut off questioning after defendant invoked his right to counsel, and the officers informed defendant of the evidence the State had linking defendant to the crime. The officers did not give defendant any additional information aside from what E.M.P. told the officers following the initial report. Defendant, by his own admission, indicated that the officers did not coerce him into making a statement without an attorney present. Since the record does not indicate that Detective McRae and Officer Cruz went beyond disclosing the evidence against defendant, we find no abuse of discretion in the district court's denial of defendant's motion to suppress.
Assignment of Error Two-Denial of Motion for New Trial
In defendant's second assignment of error, he argues the district court erred in denying his motion for new trial which was based, in part, on the erroneous denial of the motion to suppress discussed above. The State argues that despite filing a motion for new trial at the district court, the defendant, on appeal, fails to present any argument as to why the district court erred in denying his motion for new trial or cite to any relevant case law. A motion for new trial is governed by La. C.Cr.P. art. 851 :
A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:
(1) The verdict is contrary to the law and the evidence.
(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error.
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.
(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment.
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
(6) The defendant is a victim of human trafficking or trafficking of children for sexual purposes and the acts for which the defendant was convicted were committed by the defendant as a direct result of being a victim of the trafficking activity.
Defendant filed a motion for new trial on November 13, 2015, which was not ruled upon prior to defendant's original sentencing on December 10, 2015. On defendant's first appeal to this Court, we vacated defendant's sentence and remanded with instructions for the district court to rule on defendant's motion for new trial. Upon remand, the motion for new trial was denied by the district court on January 26, 2017.
*1261 As to defendant's argument regarding the erroneous denial of his motion for new trial, defendant failed to brief this assignment of error. All assignments of error must be briefed and the appellate court may consider as abandoned any assignment of error that has not been briefed. La. U.R.C.A. 2-12.4. Therefore, we find that defendant has abandoned this assignment of error, and accordingly decline to consider the merits of the assignment. La. U.R.C.A. 2-12.4; see also State v. Robinson , 11-12 (La. App. 5 Cir. 12/29/11), 87 So.3d 881, 909.
Assignment of Error Three-Excessiveness of Sentences
Defendant was sentenced to the maximum sentence for each conviction. On appeal, he asserts his sentences are unconstitutionally excessive.[12] Defendant claims the district court abused its discretion in imposing defendant's sentences by failing to consider his personal history, lack of criminal record, and potential for rehabilitation. Defendant acknowledges the disturbing facts of this case and the revulsion society has for his crimes. Nevertheless, he argues the crimes he committed do not fall within the most serious violations of the offenses charged and he is not among the worst class of offenders-the group of defendants which receive maximum or near maximum sentences.
Defendant was convicted of sexual battery of a child under thirteen and attempted aggravated rape of a victim under thirteen. A conviction for sexual battery of a child under thirteen carries a possible sentence of "imprisonment at hard labor for not less than twenty-five years nor more than ninety-nine years. At least twenty-five years of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence." La. R.S. 14:43.1(C)(2).[13] The potential sentence for attempted aggravated rape of a victim under thirteen is imprisonment "at hard labor for not less than ten years nor more than fifty years without benefit of parole, probation, or suspension of sentence." La. R.S. 14:42 ; 14:27.
The Eighth Amendment of the United States Constitution prohibits punishments that are excessive in relation to the crime committed. Coker v. Georgia , 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982, 989 (1977). The Louisiana Constitution of 1974 deliberately includes an identical prohibition to its federal counterpart by banning the legislature from enacting any law that "shall subject any person to ... excessive ... punishment." Louisiana Constitution of 1974, art. I, § 20 ; State v Smith , 01-2574 (La. 1/14/03), 839 So.2d 1, 4 ; see also State v. Nguyen , 06-969 (La. App. 5 Cir. 4/24/07), 958 So.2d 61, 64, writ denied , 07-1161 (La. 12/7/07), 969 So.2d 628 ("The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment.")[14]
*1262 The district court is given wide discretion to impose a sentence within the sentencing range provided by a criminal statute. By providing large statutory ranges for sentences, the legislature intended for district courts to have vast discretion to sentence a defendant according to the particular facts of the crime committed. State v. Sepulvado , 367 So.2d 762, 766 (La. 1979). The district court's sentencing discretion, however, has limits; the court cannot punish a defendant with a sentence, regardless of whether it is within the statutory limits, if it is grossly disproportionate to the severity of the offense or imposes needless and purposeless pain and suffering on the convicted. State v. Wilmot , 13-994 (La. App. 5 Cir. 5/14/14), 142 So.3d 141, 148 ; Nguyen , 958 So.2d at 64 (citing State v. Lobato , 603 So.2d 739 (La. 1992) ). An appellate court cannot set aside a sentence absent a manifest abuse of discretion. Smith , 839 So.2d at 4 (citing State v. Cann , 471 So.2d 701, 703 (La. 1985) ). When reviewing a sentence for excessiveness, the relevant inquiry is not whether a different sentence would be more appropriate, but whether the district court abused its vast sentencing discretion. Id. (citing State v. Walker , 00-3200 (La. 10/12/01), 799 So.2d 461, 462 ). Part of the abuse of discretion inquiry requires a court to consider the crime and the punishment given in light of the crime's harm to society and gauge whether the penalty is so disproportionate as to shock the sense of justice. Wilmot , 142 So.3d at 148-49 (citing State v. Allen , 03-1205 (La. App. 5 Cir. 2/23/04), 868 So.2d 877 ).
As a general rule, maximum sentences are reserved for the most serious violations of the offense charged, and for the worst class of offenders. Id. at 149 *1263 (citing State v. McCorkle , 97-966 (La. App. 5 Cir. 2/25/98), 708 So.2d 1212, 1218 ); State v. Pearson , 07-332 (La. App. 5 Cir. 12/27/07), 975 So.2d 646, 656 (citing State v. Rhea , 03-1273 (La. App. 5 Cir. 2/23/04), 868 So.2d 863, 870 ). Under a review to determine whether the sentence is excessive or the crime is among the most serious violations of the offense charged and the defendant is among the worst class of offenders, a court evaluates: (1) the nature of the crime, (2) the nature and background of the offender[15] , and (3) the sentences imposed for similar crimes by the same and other courts. State v. Bruce , 11-991 (La. App. 5 Cir. 10/30/12), 102 So.3d 1029, 1035, writ denied , 12-2568 (La. 4/26/13), 112 So.3d 839 ; Pearson , 975 So.2d at 656 (citing State v. Brown , 04-230 (La. App. 5 Cir. 7/27/04), 880 So.2d 899, 902 ).[16]
Sentence for Sexual Battery
As discussed herein, considering these three factors, we find that the district court abused its vast sentencing discretion and that defendant's ninety-nine year sentence for sexual battery of a child under thirteen in violation of La. R.S. 14:43.1 is unconstitutionally excessive. While we are painfully conscious of the seriousness of this offense, the ongoing suffering E.M.P. must endure and the lifelong impact this may have upon her, we find that defendant's crime does not fit the category of the most serious violations of the offense charged committed by the worst type of offender necessary for a maximum sentence.
With regard to the first factor, the nature of the crime, jurisprudence indicates a maximum, or nearly maximum sentence for sexual battery of a minor may not be excessive if a defendant exploits a position of trust to commit the crime. State v. Wilmot , supra , at 149, (citing State v. Badeaux , 01-406 (La. App. 5 Cir. 9/25/01), 798 So.2d 234, writ denied , 01-2965 (La. 10/14/02), 827 So.2d 414 ). Here, defendant had an excellent relationship with E.M.P.'s family. Defendant met the victim's father six years prior to the crime through work and became good friends. To E.M.P's father, defendant was a competent worker and never seemed mentally slow. Eventually, when defendant fell on hard times, he was invited to live in their family home and was provided his own room and bathroom.[17]
E.M.P., her father, and her mother all recalled the friendship between E.M.P and the defendant. E.M.P. liked defendant and enjoyed playing with him. Her father believed his daughter "loved [defendant] very *1264 much. He was a very special person for her, for my daughter," and E.M.P.'s mother trusted defendant to watch her children at home alone while she ran errands. At the December 10, 2015 sentencing, the State read a victim impact statement submitted by the victim's mother displaying defendant's violation of her family's trust. It read:
Mr. Noe, I know it's a difficult day for you because you are going to find out the consequences for your bad behavior of the big damage you caused to my family and the damage you did to my daughter. That girl loves you very much more than her own uncles and you took advantage of her with your sick mind. This day I am calm and satisfied with the law because they did a good job because a person like you can't be outside destroying families and other children. In our case, there was no motive to do what you did, to do something like that. We respected you. We included you in our family. We taught you the roads of the church. We gave you a roof, a job to support your family, a car, and I gave you food when you were hurt. I brought food to your bed and the most important thing, placed in our heart and even like that, you did something terrifying. You do not deserve to be outside. This is the law of this world but you lack the laws of God and repent.
The district court considered this impact statement during sentencing, and, according to the court, the crime necessitated the maximum sentences because "[defendant] committed the ultimate sin against [the family] by stealing the innocence of this young child...."
Although it is not completely clear how many times defendant abused E.M.P., there is little evidence to prove a prolonged pattern of abuse nor that penetration occurred during the June 2013 incident. According to defendant's statement to Detective McRae and Officer Cruz, the abuse occurred once and defendant rubbed his penis against E.M.P.'s vagina skin-to-skin while masturbating, which did not include penetration. Defendant told police he ejaculated on E.M.P's stomach and cleaned the semen off with E.M.P.'s panties.
In E.M.P's forensic interview with Ms. Bergeron, E.M.P. said she could not remember how many times defendant touched her, nor whether defendant's private "went in." Ms. Troy's physical examination of E.M.P. focused on the June 2013 incident and did not reveal injury to E.M.P.'s vagina; however, that finding is not unusual for a victim of sexual abuse. At trial, E.M.P. testified that she told defendant not to touch her private, that the touching occurred more than once, that defendant "licked [her] private part," and that defendant told her not to tell anyone, because it was a "secret."
In this circuit, there appears to be only one case in which a defendant-without a previous criminal record-convicted of a sexual battery of a child under the age of thirteen received a maximum ninety-nine year sentence. That crime was particularly heinous as the sexual abuse continued for years. In Wilmot , supra , the victim was abused by her mother's live-in boyfriend over a period of six years. The victim displayed a clear trust for defendant, referring to him as "daddy." Id. at 145. According to the victim, the pattern of abuse began with touching and oral sex performed by defendant, and as the victim got older the abuse escalated to the point where the defendant engaged in two instances of vaginal sex and one instance of anal sex. The defendant also forced the victim to perform oral sex on him. After his arrest, the defendant gave a voluntary statement to police admitting to oral and vaginal sex with the victim, but maintained the sexual contact was initiated by the *1265 victim. At trial, the defendant testified on his own behalf and changed his story-claiming to have never had sexual contact with the victim, and his confession was the product of consuming a large amount of crack cocaine and prescription pain medication. We found the defendant's sentence-despite it being the defendant's first conviction-was not an abuse of discretion, because the abuse lasted years, the victim looked up to the defendant as a father figure, and actions of the defendant fractured the victim's family life. Id. at 149.
Further, the jurisprudence from other circuits shows that maximum sentences or near maximum sentences are reserved for crimes where the nature of the crime is one of long-term or repeated sexual abuse of the victim. See State v. Howard , 10-0285 (La. App. 1 Cir. 9/10/10), 2010 WL 3527433, 2010 La. App. Unpub. LEXIS 471 (defendant-father was sentenced to twenty years, the maximum sentence, for the long-term oral sexual battery of his daughter); State v. Penn , 93-0174 (La. App. 1 Cir. 11/24/93), 633 So.2d 337, 337-38 (defendant, a teacher at the victim's school, was sentenced to seven years-nearly the maximum sentence at the time for indecent behavior with a juvenile-after eight months of daily abuse which included teaching the twelve-year-old victim to masturbate, kissing the victim, fondling the victim's breasts, and oral sex).
Regarding the second factor, the nature and background of the offender, defendant had no prior criminal record. Research reflects that defendants with a prior criminal record are more likely to receive a maximum or near maximum sentence for sexual battery of a minor. See State v. Blake , 50,732 (La. App. 2 Cir. 6/22/16), 198 So.3d 181, 186, writ denied , 16-1456 (La. 5/26/17), 221 So.3d 80 (wherein the Second Circuit affirmed the constitutionality of a maximum sentence for sexual battery where the defendant was a seven-time felony offender who failed to comply with his parole restrictions). Defendants with less substantial criminal records than the defendant in Blake , supra , generally receive sentences above the statutory minimum of twenty-five years for sexual battery but do not receive the maximum sentence. See State v. Pontiff , 14-1049 (La. App. 3 Cir. 5/6/15), 166 So.3d 1120, 1149-1152, writ denied , 15-1107 (La. 10/28/16), 209 So.3d 94 (defendant, who according to a presentence report had previously been convicted of indecent behavior with a juvenile and received a seven-year sentence and convicted of simple burglary, was sentenced to thirty years for sexual battery); State v. Evans , 48,471 (La. App. 2 Cir. 12/18/13), 130 So.3d 965, 968 (defendant's sentence of fifty years at hard labor, with twenty-five years of the sentence to be served without the benefit of parole was affirmed after considering a pre-sentencing investigation, which revealed two prior felony convictions for contributing to the delinquency of juveniles and molestation of juveniles, three prior misdemeanor convictions and fourteen previous arrests); Badeaux, 798 So.2d at 239 (defendant received the maximum sentence for sexual battery and the court considered the pre-sentence report, among other factors, which indicated "although this is the defendant's first felony offense, the defendant was accused of molestation charges involving his former stepdaughters in 1982. The report indicates that the defendant's brother said the defendant was 'an exhibitionist, pedophile, and a manic-depressant.' "); State v. Frith , 30,555 (La. App. 2 Cir. 4/8/98), 711 So.2d 388, 389-92 (defendant pled guilty and was sentenced to the maximum sentence at the time-ten years-for sexual battery of a seven-year-old male after twice inserting his finger in the child's anus; the appellate court affirmed the sentence, in part, because of *1266 defendant's two prior felony convictions including one for sexual battery of a five-year-old and two misdemeanor convictions for theft and burglary).
Considering the third factor-sentences imposed for similar crimes in this and other circuits-the jurisprudence reflects that defendants sentenced for crimes where there are limited instances of abuse by the offender with no criminal record receive sentences between thirty-five and fifty-years. See State v. Lilly , 12-0008 (La. App. 1 Cir. 9/21/12), 111 So.3d 45, 49-50 (wherein the First Circuit affirmed a thirty-five year sentence for a fifty-seven-year old first-time felony offender convicted of sexual battery involving a single instance of abuse when he touched the victim's vagina with his fingertip while he and his wife were babysitting his wife's grandchildren); see also State v. Dixon , 18-79 (La. App. 5 Cir. 8/29/18), 254 So.3d 828 (wherein this Court recently found a statutory ninety-nine year sentence for sexual battery unconstitutionally excessive where the defendant, a first-time felony offender, digitally penetrated his two-year-old sister in connection with the production of child pornography. In vacating the ninety-nine year sentence for sexual battery, this Court found that a thirty-five to forty year sentence would be constitutionally reasonable).
Considering the factors-the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes by the same court and other courts-and a review of the record and jurisprudence, the evidence does not support a conclusion that this crime was the most serious violation with the worst type of offender. Defendant's maximum sentence of ninety-nine years without the benefit of probation, parole, or suspension of sentence for sexual battery of a child under thirteen is disproportionate and shocks one's sense of justice. Therefore, we vacate defendant's sentence for sexual battery and remand the matter for resentencing. Pursuant to La. C.Cr.P. art. 881.4(A), this Court may provide direction regarding a constitutionally reasonable sentence in a given case. Considering the factors evaluated above, we suggest a sentence of thirty-five to fifty-five years for the conviction of sexual battery to run concurrently with the sentence for attempted aggravated rape would be a constitutionally reasonable sentence.
Sentence for Attempted Aggravated Rape
Defendant was also convicted of attempted aggravated rape of a victim under thirteen in violation of La. R.S. 14:27, 14:42. The sentencing range for attempted aggravated rape of a victim under thirteen is imprisonment "at hard labor for not less than ten years nor more than fifty years without benefit of parole, probation, or suspension of sentence." La. R.S. 14:27(D)(1)(a) ; 14:42. Defendant was sentenced to the statutory maximum of fifty years imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence.
On appeal, defendant argues this sentence is unconstitutionally excessive. After a review, we find the district court again abused its vast sentencing discretion when sentencing defendant to the maximum fifty years without the benefit of parole, probation, or suspension of sentence.
When considering the nature of the crime, as discussed above, defendant had a close relationship with the family, but engaged in limited instances of touching and oral sex with E.M.T., not a repeated, long-term pattern of abuse or conduct that manifests deliberate cruelty to the victim which is consistent with a maximum sentence. For example, in *1267 State v. Haynes , 44,868 (La. App. 2 Cir. 12/9/09), 26 So.3d 310, the Second Circuit upheld a maximum fifty-year sentence for a defendant, who pled guilty to attempted aggravated rape. In Haynes , the defendant repeatedly forced the victim to engage in various sexual acts-including placing his genitals against her genitals, oral sex, and digitally penetrating the victim-almost every night for a year. Id. at 311. See also State v. York , 48,230 (La. App. 2 Cir. 8/7/13), 121 So.3d 1226, writ denied , 13-2154 (La. 3/21/14), 135 So.3d 617 (wherein the Second Circuit upheld a maximum fifty-year sentence for attempted aggravated rape of a mentally handicapped 32-year-old woman.[18] According to trial testimony, the victim was unable to drive a car or manage money, had the mental age of a five-year-old, and worked at the Caddo-Bossier Association for Retarded Children. In affirming the maximum sentence, the Court considered that defendant was also convicted of the rape of his five-year-old daughter).
Regarding the second factor, the nature of the offender, defendant has no prior criminal record. Further, during his custodial interview with Detective McRae and Officer Cruz, defendant showed some remorse for his actions-stating that it's better to tell the truth than to continue lying. (Compare Haynes , supra , in which the defendant was initially charged with three counts of aggravated rape, one count of molestation of a juvenile and one count of indecent behavior with a juvenile, and notwithstanding a guilty plea in accordance with a plea bargain that reduced the charges to one count of attempted aggravated rape, did not show any remorse for his crimes. State v. Haynes , 26 So.3d at 311.)
Considering the third factor, with regard to convictions for attempted aggravated rape which carry the statutory maximum of fifty years without benefit of parole, probation, or suspension of sentence, jurisprudence dictates that maximum sentences-as shown by Haynes and York , supra -are reserved for more serious instances of abuse by offenders who continually abuse their victims. The jurisprudence does not reveal a case similar to this one where the maximum sentence was imposed. Here, although the crime is indisputably repugnant, the sentence is disproportionate because defendant, who had no prior criminal record, expressed remorse for his wrongdoing which was limited to a single victim and did not involve proof of continuous and longstanding abuse.
Therefore, for the reasons provided herein, we vacate defendant's sentence for attempted aggravated rape, and remand the matter for resentencing. As discussed above, considering the facts of this case, we suggest a sentencing range of thirty-five to forty years for the conviction of attempted aggravated rape to run concurrently with the sentence for the conviction for sexual battery would be constitutionally reasonable. See La. C.Cr.P. art. 881.4(A).
Errors Patent
This court routinely reviews criminal appellate records for errors patent in accordance with La. C.Cr.P. art. 920 ; State v. Oliveaux , 312 So.2d 337 (La. 1975) ; and State v. Weiland , 556 So.2d 175 (La. App. 5th Cir. 1990), regardless of whether a defendant makes a request for errors patent *1268 review. The record reflects the following error patent:
Post-Conviction Relief Advisal
The transcript reveals that the district court did not advise defendant of his right to seek post-conviction relief. La. C.Cr.P. 930.8. The commitment reflects that the district court informed defendant that he had two years from the judgment of conviction to seek post-conviction relief, however, the transcript does not so reflect. It is well settled law that if the district court does not advise a defendant of the right to post-conviction relief pursuant to La. C.Cr.P. 930.8, the appellate court may correct this error by informing defendant of the prescriptive period for post-conviction relief. State v. Ducksworth , 17-35 (La. App. 5 Cir. 12/13/17), 234 So.3d 225, 237. Accordingly, we advise defendant that an application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed within two years from when the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.
Decree
For the reasons provided herein, we affirm defendant's convictions for sexual battery of a victim under thirteen and attempted aggravated rape of a victim under thirteen. However, we find defendant's sentences to be unconstitutionally excessive. Accordingly, we vacate defendant's sentences and remand this matter to the trial court for resentencing consistent with this opinion.
CONVICTION AFFIRMED; SENTENCES VACATED; REMANDED FOR RESENTENCING
JOHNSON, J., CONCURS WITH REASONS
I, respectfully, concur with the majority opinion in this matter. After review of the evidence and applicable jurisprudence, I find that the trial court abused its discretion in failing to suppress Defendant's statement made during custodial interrogation because the interrogating officers violated Defendant's right to an attorney.
Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his Miranda rights, that he voluntarily and intelligently waived his Miranda rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement, or promises. State v. Franklin , 03-287 (La. App. 5 Cir. 9/16/03), 858 So.2d 68, 70, writ denied , 03-3062 (La. 3/12/04), 869 So.2d 817 ; State v. Blank , 04-0204 (La. 4/11/07), 955 So.2d 90, 103, cert. denied , 552 U.S. 994, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007). A determination of voluntariness is made on a case-by-case basis, depending on the totality of the facts and circumstances of each situation. State v. Arias-Chavarria , 10-116 (La. App. 5 Cir. 9/28/10), 49 So.3d 426, 433, writ denied , 10-2432 (La. 2/25/11), 58 So.3d 460.
Once a suspect in custody expresses a desire, at any stage in the process, to deal with the police only through counsel, all questioning must cease, and the accused is not subject to further interrogation until counsel has been made available to him, unless he initiates further communication, exchanges or conversation with the police and validly waives his earlier request for counsel. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981) ; Miranda v. Arizona , 384 U.S. 436, 440-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) ; State v. Abadie , 612 So.2d 1 (La. 1993), cert. denied , 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993). Miranda and Edwards are prophylactic *1269 rules designed to protect an accused against the inherently compelling pressures of custodial interrogation, whether by police badgering, overreaching, or subtle but repeated efforts to wear down an accused's resistance and make him change his mind. Oregon v. Bradshaw , 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983) ; Rhode Island v. Innis , 446 U.S. 291, 298-99, 100 S.Ct. 1682, 1688-89, 64 L.Ed.2d 297 (1980).
When a defendant exercises his privilege against self-incrimination, the validity of any subsequent waiver depends upon whether police have "scrupulously honored" his right to cut off questioning. Michigan v. Mosley , 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Whether the authorities have "scrupulously honored" an accused's right to silence is determined on a case-by-case basis under the totality of the circumstances. State v. Brooks , 505 So.2d 714, 722 (La. 1987), cert. denied , 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987) ; State v. Harper , 430 So.2d 627, 633 (La. 1983). Factors entering into the assessment include who initiates further questioning; whether there has been a substantial time delay between the original request and subsequent interrogation; whether Miranda warnings are given before subsequent questioning; whether signed Miranda waivers are obtained; and, whether the later interrogation is directed at a crime that had not been the subject of the earlier questioning. Michigan v. Mosley , 423 U.S. at 105, 96 S.Ct. 321 ; State v. Brooks, supra .
When an accused invokes his Miranda right to counsel, the admissibility of a subsequent confession or incriminating statement is determined by a two-step inquiry: (1) did the accused initiate further conversation or communication; and (2) was the purported waiver of counsel knowing and intelligent under the totality of the circumstances. Abadie, 612 So.2d at 5-6.
In Abadie , 612 So.2d at 6, the supreme court defined interrogation as follows:
The term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis , 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). This is an objective test which does not require a determination of the actual perception of the suspect but prohibits police speech or conduct that creates a situation in which the suspect probably will experience the functional equivalent of direct questioning by concluding that the police are trying to get him to make an incriminating response.
In this matter, after considering the totality of the circumstances involving Defendant's inculpatory statement, I conclude that the interrogating officers in this matter did not "scrupulously honor" Defendant's invocation of his Miranda right to counsel. After Defendant indicated he wanted an attorney present, Detective Joseph McRae and Officer Cesari Cruz failed to provide Defendant with an opportunity to have an attorney present with him in the interrogation room. Instead, immediately after Defendant invoked his right to an attorney, the interrogating officers began to inform Defendant of the information provided to them by the victim. Here, unlike the cases cited by the majority opinion that involved brief conversations or recitations of the evidence, the testimony during the suppression hearing and at trial does not indicate that the recitation of the evidence against Defendant was brief.
The officers testified that Defendant was not given a break between the time of his request for an attorney and the time he was informed of the evidence against him.
*1270 Additionally, there is no testimony that Defendant requested to be informed of the evidence against him. Detective McRae testified that the total time from when Defendant entered the interrogation room until the recorded statement started was approximately 95 minutes. The officers then spent approximately 40 minutes reviewing the rights form and informing Defendant of everything the victim stated in detail. Detective McRae further testified that it would have been "impossible" for all of the details of the victim's statement to be disclosed to Defendant within 17 minutes. The amount of time the officers spent "informing" Defendant of the evidence against him cannot, by any means, be considered "brief."
After reviewing this evidence, I find that the officers did not "scrupulously honor" Defendant's right to have an attorney present for further questioning but rather continued the subtle interrogation without any initiative by Defendant. The officers' disclosure of the evidence in this matter took a substantial amount of time to complete. This evidence, coupled with the fact that Defendant was not provided an opportunity to have an attorney present, shows that the officers knew that it was reasonably likely they would elicit an incriminating response from Defendant, which is exactly what occurred. I opine that the officers' actions and speech was the functional equivalent of direct questioning and was in violation of the Edwards rule, which was designed to protect an accused in police custody from being badgered by the police officers. See , State v. Lee , 524 So.2d 1176, 1184 (La. 1987), rehearing granted , 524 So.2d 1176 (La. 1988).
However, I also find that the admission of Defendant's inculpatory statement by the trial court was harmless error. The erroneous admission of a statement or confession is subject to a harmless error analysis. State v. Robinson , 11-12 (La. App. 5 Cir. 12/29/11), 87 So.3d 881, 904. An error is harmless if it can be said beyond a reasonable doubt that the guilty verdict in the case was surely not attributable to that error. Id. The victim's statement and the parents' testimonies were admitted into evidence, and that evidence would have been sufficient to convict Defendant of the charges against him.
Accordingly, for the foregoing reasons, I find the trial court abused its discretion in failing to suppress Defendant's inculpatory statement made during custodial interrogation and concur in the result of the majority opinion.

In 2015, the Louisiana legislature redesignated "aggravated rape" as "first degree rape." State v. Aguliar-Benitez , 16-336 (La. App. 5 Cir. 12/7/16), 206 So.3d 472, 473 n.1 (citing Acts 2015, No.184 § 1, eff. Aug. 1, 2015).

In the interest of protecting minor victims and victims of sexual offenses as set forth in La. R.S. 46:1844(W)(3), the judges of this Court have adopted a policy that this Court's published work will use only initials to identify the victim and any defendant or witness whose name can lead to the victim's identity (i.e., parent, sibling, or relative with the same last name as the victim).State v. E.J.M., III , 12-774 (La. App. 5 Cir. 5/23/13), 119 So.3d 648, 652, n.1.

E.M.P.'s father, R.M., testified that he met defendant through work about six years before defendant moved in with his family. He testified that defendant was a good friend and a reliable work partner. E.M.P.'s family had a good relationship with defendant and he was left alone at the home with the children. For E.M.P.'s mother, the abuse is "the greatest psychological trauma I have lived in my 38 years."

E.M.P.'s father believed E.M.P. "loved [defendant] very much. He was a very special person for her, my daughter." At trial, E.M.P, M.P., and R.M. all testified to the close relationship between E.M.P. and defendant, that E.M.P. told her mother about the abuse, and that defendant was a houseguest living in the family home.

Officer Cruz testified that he is a native Spanish speaker and has previously translated for other officers during his employment at the Kenner Police Department.

384 U.S. 436, 86 S.Ct. 1602, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Officer Cruz, until that point, was not involved in the investigation and did not know any of the facts of the case revealed during the investigation.

Officer Cruz's trial testimony corroborates Detective McRae's testimony that interrogation ceased after defendant invoked his Miranda rights. Officer Cruz testified that he and Detective McRae did not ask questions, rather they simply stated the facts the victim told the police.

Officer Cruz confirmed during his testimony that as soon as defendant asked for an attorney, questioning ceased, and defendant was told "[l]ook, we cannot talk to you right now because you said you want an attorney."

Officer Cruz testified that due to defendant's third grade level education, he filled out the Advice of Rights Form and corrected the form after defendant changed his mind to give a statement to police. Defendant placed his first name on the advice of rights form to further reflect his waiver of rights. Officer Cruz testified it was common practice for him to assist in completing the forms for non-English speaking defendants with little reading ability.

Officer Cruz explained that there was:
no, no break. As soon as he asked for an attorney we-we concluded the interview, the -the interrogation, because, at that point, obviously, he doesn't want to speak without an attorney. We explained-started explaining to him the case, the incident and everything else, and at that time he voluntarily stated he wanted to speak to us without an attorney and we stopped him, and said, 'Look, we cannot talk to you right not because you said you want an attorney.' At that point in time, he voluntarily said, 'No, I'll talk.' And we -no, go ahead.

This Court vacated defendant's original sentences, which were also the statutory maximums, on December 7, 2016, on procedural grounds. Aguliar-Benitez , supra . Defendant was resentenced to the statutory maximum on both counts on February 23, 2017.

In 2011, the Louisiana Legislature increased the sentencing range for sexual battery. See La. Acts 2011, No. 67. Before the revisions, sexual battery of a minor carried a sentence "with or without hard labor, without benefit of parole, probation, or suspension of sentence, for not more than ten years." La. Acts 1995, No. 946. The current statute increases the penalty for a conviction to a sentence ranging from twenty-five to ninety-nine years at hard labor. La. R.S. 14:43.1(C)(2).

The United States Supreme Court has articulated that punishment should be proportional to the nature of the crime committed. Kennedy v. Louisiana , 554 U.S. 407, 419, 128 S.Ct. 2641, 2649, 171 L.Ed.2d 525, 538 (citing Weems v. United States , 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910) ). Therefore, sentences should be grounded in the norms that "currently prevail," in a maturing society-meaning that a proper sentence or sentencing range can change over time. Id. (citing Atkins v. Virginia , 536 U.S. 304, 311, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) ; Trop v. Dulles , 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) ). Under the evolving standards test, the court evaluates three sentencing principles: rehabilitation, deterrence, and retribution. Id. at 420, 128 S.Ct. 2641 (citing Harmelin v. Michigan , 501 U.S. 957, 999, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) ). Most often, a sentence is unconstitutionally excessive due to a punishment's unnecessary need to enact retribution upon the defendant. Id.
The sentencing range for sexual battery in Louisiana differs widely from the ranges of other southern states. In Alabama, sexual abuse of a child under 12 is a Class B felony. Ala. Code § 13A-6-69.1. A Class B felony in Alabama carries a prison term ranging between two and twenty years. Ala. Code § 13A-5-6. In Arkansas, second degree sexual assault is a Class B felony, which carries a sentencing range of five to twenty-five years. Ark. Code Ann. §§ 5-14-125 ; 5-4-401. In Florida, an individual over eighteen who commits lewd or lascivious molestation of a person less than sixteen years of age, commits a life felony carrying a sentence of twenty-five years but not exceeding a life sentence. Fla. Stat. Ann. §§ 800.04(4) ; 775.082. In Georgia, a child molestation carries a sentence between five and twenty years. Ga. Code Ann. § 16-6-4. In Kentucky, sexual abuse in the first degree is a Class C felony, which carries a sentence between five and ten years. Ky. Rev. Stat. Ann . §§ 510.110 ; 532.060. In Mississippi, touching or handling a child carries a sentence between two and thirteen years. Miss. Code Ann. § 97-5-23(1). In North Carolina, a statutory sexual offense with a child under thirteen years old is a Class B1 felony carrying a sentencing range between eight and thirty years. N.C. Gen. Stat. §§ 14-27.30 ; 15A-1340.17. In South Carolina, criminal sexual conduct with a minor in the first degree carries a minimum sentence of twenty-five years. S.C. Code Ann . § 16-3-655. In Tennessee, aggravated sexual battery is a Class B felony, which carries a sentence between eight and thirty years. Tenn. Code Ann. §§ 39-13-504 ; 40-35-111. In Texas, indecency with a child is a second degree felony, which carries a sentence between two and twenty years. Tex. Penal Code §§ 12.33 ; 21.11. In Virginia, aggravated sexual battery carries a sentence between one and twenty years. Va. Code Ann. § 18.2-67.3.

The United States Supreme Court emphasizes that ' "[h]ighly relevant-if not essential-to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.' Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.' " Pepper v. United States , 562 U.S. 476, 488, 131 S.Ct. 1229, 1240, 179 L.Ed.2d 196 (2011) (internal citations omitted).

The district court uses a different criteria to determine the length of a sentence. Specifically, the district must consider the aggravating and mitigating circumstances enumerated in La. C.Cr.P. art. 894.1. State v. Evans , 48,471 (La. App. 2 Cir. 12/18/13), 130 So.3d 965, 967 (citing State v. Smith , 433 So.2d 688 (La. 1983) ; State v. Watson , 46,572 (La. App. 2 Cir. 9/21/11), 73 So.3d 471 ). Here, the district court complied with the requirements of La. C.Cr.P. art. 894.1 by considering the victim impact statement submitted by E.M.P.'s mother in which she stated that defendant took advantage of a family that gave defendant a place to stay and robbed the innocence of a young child.

The record does not clearly reflect when defendant moved into the home, nor how long he lived in the home.

Despite the victim's age, the crime committed against her falls under attempted aggravated rape, because aggravated rape occurs when the victim is unable to resist due to "physical and or mental infirmity." La. R.S. 14:42. Further, an attempt is defined as "a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt." La. R.S. 14:27.